(No. 24466.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JUSTIN L. MITCHELL, Plaintiff in Error.

*Opinion filed February 17, 1938—Rehearing denied April 7, 1938.*

Shaw, J., dissenting.

Simon Herr, (Wm. Scott Stewart, of counsel on re-hearing,) for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and A. B. Dennis, (Edward E. Wilson, John T. Gallagher, Melvin S. Rembe, and Blair L. Varnes, of counsel,) for the People.

Mr. Justice Wilson delivered the opinion of the court:

The defendant, Justin L. Mitchell, was found guilty of manslaughter in a trial before a jury in the criminal court of Cook county under an indictment charging him with the murder, by abortion, of Mary Nowakowski, also known as Mary Novak. Motions for a new trial and in arrest of judgment were overruled and defendant was sentenced to imprisonment in the penitentiary for an indeterminate term of from one to fourteen years. The cause is before this court on writ of error.

Stephen Zakes, thirty-nine years old and a milk wagon driver by occupation, was the principal witness for the People. He had been married twice and had one child by each marriage. From Zakes' testimony it appears that he

had been keeping company with Mary Novak for about fourteen months prior to March 30, 1935, and that they were to have been married the following May. He admitted having had sexual intercourse with her a short time before Christmas, 1934, and again in February, 1935. On March 27, 1935, he accompanied her to the office of Dr. Victor J. Neale in Chicago where, out of his presence, she talked to the doctor for about fifteen minutes. The witness testified that Dr. Neale told her in his presence that she was pregnant and suggested that he take her to see the defendant. Zakes and Mary Novak went to the office of defendant on Friday evening, March 29, where she informed defendant that Dr. Neale had said she was pregnant. Defendant, according to Zakes' testimony, then placed her on a table, made an examination, found that she had been pregnant for at least eight weeks, told her that an operation would cost $50 and requested her to return at 8:00 o'clock the next morning. He assured them that there was no danger in the operation. Zakes reached defendant's office about 11:00 o'clock the following morning, having previously visited his safety deposit box at a bank. Upon his arrival he inquired relative to the young woman and defendant replied, "She will be all right, she is in a little pain just now." Zakes found her in agony. The doctor asked him to set her up but when he complied she was so weak she was compelled to lie down again. Defendant then observed, "They are all weak after an operation of that kind." Zakes gave the defendant $50 and the latter left the office for about twenty minutes, saying he was very busy as he was going to move his office into another part of the building. When he and Miss Novak departed between 11:30 and noon she was weak and chilly. After repairing to a drug store for coffee and toast they went to a cab stand where she became violently ill. He then took Mary to her home and she immediately went to bed. The witness remained with her until about 1:00 A. M. Sunday morning.

By Tuesday, April 2, defendant's office had been moved into another part of the building. Zakes informed defendant that Mary Novak was in a hospital and protested he had not performed the proper operation. He further testified that defendant, on this occasion, declared: "Well, everything is all right after three or four days. I will pay the bill and everything," but without specifying what bill. Four days after the operation Mary Novak died.

Dr. Neale, in his testimony, recalled that the deceased had visited his office in company with Zakes whom he had not previously known, and that he talked with her and made a vaginal examination. When he informed Mary Novak she had been pregnant from two to two and one-half months she began to cry, "What will I do?" Zakes inquired where she could have it done and the witness replied, "I don't know. There is lots of them done every day." The doctor added that although he told Zakes he could go to some busy corner defendant's name was not mentioned. Dr. Neale was called to see Mary Novak at her home on the evening of March 30. She was in bed, apparently in pain. The doctor took her pulse and prescribed morphine. He admitted testifying at the coroner's inquest that Zakes stated to him on this visit, "We had an abortion performed," qualifying the admission, however, by stating that Zakes did not tell him who did it.

Dr. G. M. Redman, who was summoned to the home of the deceased between 4:00 and 5:00 o'clock on the morning of March 31, found her in bed, took her at once in his car to a hospital where she was taken to the operating room and given medicine to contract the uterus. Blood continued to flow from it and he decided a curettement was necessary, communicated with the coroner's office and then curetted the patient's womb from which he removed the head of a fetus. He also found a mascerated cervix filled with blood and torn to some extent, indicating that she had had some instrumentation. The coroner's physician, Dr. Perry J.

Melnick, performed the *post-mortem*. Based upon his examination of the uterus and other portions of the body of the deceased the doctor expressed the opinion the condition he found could have been caused by instrumentation and that Mary Novak died from sepsis and hemorrhage, following a severe gangrenous infection of the uterus and retained placental tissue.

Marie Hansen, now Marie Schaeffer, testified that she visited defendant in his office for the first time in June, 1932. She told defendant she was pregnant and asked him to "fix me up." He stated the price would be $40. When she returned the next day, as arranged, the defendant put her on a table and placed a towel over her face. She awakened in about half an hour feeling weak but went home. Mrs. Hansen was not pregnant after leaving defendant's office. On May 14, 1934, she took Mary Schwartz to the office of defendant, informed him that her friend was pregnant and requested him "to fix her up." A price was agreed upon. Defendant then examined Mary Schwartz and diagnosed her condition as pregnancy, observing that she was about three months pregnant. When the two women returned with the money on the appointed day, defendant put on a gown and took Mary into a private room from which she emerged in about half an hour quite weak, being unable to walk. Mrs. Hansen took Mary home and put her to bed. On Wednesday evening the latter suffered hemorrhages in Marie's presence. The next evening she and Mary accompanied by a man, called on defendant, informed him that Mary was very weak and bleeding terribly. He directed them to return Friday morning. Mrs. Hansen urged him "to do a good job" so Mary would not suffer so much, to which he replied, "Well, I will try my best." He kept Mary at his office all the next day and sent her home in the evening in a cab.

Dr. Chester C. Guy testified he examined Mary Schwartz on May 20, 1934, found her uterus markedly infected, the

lower end dilated and a piece of infected placental tissue in the lining of the uterus which indicated she had been pregnant. He also found grooves in the uterine lining indicating an instrumentation.

The principal defense interposed by defendant was an alibi. It was shown by the uncontradicted testimony that defendant's sister, Florence Eshliman, was operated on at the Auburn Park hospital, located about four blocks from defendant's office, on the morning of March 30, 1935, by Dr. Barnes, assisted by Dr. Waterman; that the defendant, at least three other persons, namely, an interne, Dr. Emil R. Zidek, a friend of the defendant, Dr. Oswin F. Koch, Julia Foster, who administered the anaesthetic, and probably two nurses were present in the operating room during the course of the operation, which began about 9 to 9:10 A. M. and was completed between 12:00 and 1:00 o'clock. The evidence further tends to show the defendant arrived at the hospital about 8:30 to 8:40 in the morning and accompanied his sister to the operating room. Dr. Zidek, Dr. Koch and Julia Foster each testified to defendant's presence in the operating room at the start of the operation and during the remainder of the morning but stated that he was in and out of the room several times for short intervals—"a matter of minutes," and "I didn't watch closely" according to Dr. Zidek; never "out of the room for more than five minutes a time" as said by Dr. Koch, and "was there most of the time, some of the time in the hallway outside of the operating room" as recounted by Julia Foster.

Ilow A. Nolan, another sister of defendant, testified that she was in the corridor outside of the operating room from 9:00 until 1:00 o'clock and that defendant was in and out of the room several times, answering the telephone and reporting how his sister was progressing. Bernice Clement, office attendant and laboratory technician for defendant, testified her usual office hours were from 9:00 until 4:00, but on Saturdays from 9:00 to 12:00, and that defendant

was not in his office during the forenoon on March 30. She knew defendant's sister was being operated on and remembered telephoning defendant several times during the morning at the hospital regarding two patients who had come to the office. Witness Clement had heard the name of Mary Nowakowski but did not recollect whether it was in connection with her duties in defendant's office. She recalled hearing defendant mention her name on or about the second or third day of April, 1935. Mrs. Clement remembered a patient in 1934 by the name of Mary Schwartz and another in connection with Mary Schwartz.

The defendant testified he had been a practicing physician in Chicago since 1909; that the first time he ever saw Marie Hansen was when she brought Mary Schwartz to his office about May 14 or 15, 1934; that Marie wanted to know if Mary Schwartz was pregnant. From his testimony it appears that he gave the latter no treatment of any kind but made a bi-manual examination out of the presence of Marie Hansen and told her she had an abscess in the posterior cul-de-sac, a pouch in back of the womb, and that the sac was purulent; that on her return two days later, he made an examination similar to the previous one, found she had a temperature slightly over 100 degrees, gave her aspirin and pyramidon as sedatives to allay her pain and advised her to go to a hospital; that he did not use any instruments on Mary Schwartz; that, in particular, he did not perform an abortion, and that, owing to the mass in her abdomen, he was unable to determine whether she was pregnant. He also denied that Marie Hansen came to his office after Mary Schwartz's second call; that she made the statement to the effect he had not done a good job on Mary Schwartz and, further, that he sent the latter home from his office in a taxicab. Defendant testified that Zakes did not call at his office on March 29, adding that he first saw Zakes on April 1 or 2 when he came to the office and announced that a girl named Mary Novak was in the hos-

pital in bad shape, wanting to know what defendant proposed to do about it. He testified, further, that in response to his inquiry as to what Zakes meant the latter answered, "Well, I had her up here Saturday, and you know what I mean;" that he then told Zakes he had never seen him before and said, "What are you trying to pull?" He said Zakes then asked him if he didn't think he should pay the hospital bill, and that upon ordering Zakes out of the office the latter countered, "I will get even with you." He categorically denied that Mary Novak was in his office on March 30, or that he ever operated on, used any instruments upon or attempted to produce an abortion on her. He then testified to his presence in the hospital from about 8:30 or 8:45 until after 12:00 o'clock during the operation on his sister, asserting he did not leave the hospital during the above period, although he went in and out of the operating room and answered two telephone calls from his office, and, further, did not report at his office the day of March 30.

To obtain a reversal, defendant makes several contentions. The first which requires consideration is that an assistant State's attorney made some improper remarks in the presence of the jury. The record shows that attorney George H. Guenther, in his examination of the jurors on their *voir dire,* asked one juror if he understood there were various penalties which might be inflicted in a case where the charge is murder and, on receiving an affirmative reply, inquired further if he understood that if he was not convinced of the defendant's guilt beyond all reasonable doubt from the evidence that he, the juror, might not get so far as to vote on the kind of penalty. He then said to the juror: "And then for the first time you determine what should your verdict be; and should it be manslaughter,—he hasn't mentioned that, but you have a right under an indictment of this kind to bring in a verdict of manslaughter, if that is the crime that is proven." An attorney for the Peo-

ple then objected and immediately addressed to the defendant's attorney the query, "Are you going to offer such a verdict?" An exception was taken to the question last quoted, the objection was sustained and the jury admonished to disregard the remark. The question assailed was improper to propound in the presence of any prospective juror, but considering the provocative nature of the preceding questions asked and the fact that the trial was otherwise free from serious error, its impropriety is not sufficient to warrant a reversal of the conviction.

The defendant next insists that the trial court committed prejudicial error in overruling his motion for a mistrial based upon the fact that because of illness, one of his counsel was unable to continue with the trial. *People* v. *O'Farrell*, 247 Ill. 44, and *Hayner* v. *People*, 213 id. 142, cited in support of his contention, are not controlling in the situation which obtained here. The record shows that George H. Guenther and Hugh R. Porter were the attorneys representing defendant when the trial commenced; that Guenther, a veteran at the bar, now deceased, assisted in the selection of the jury and during the examination of the first witnesses, including witness Zakes. Porter, the record further discloses, was an experienced and competent lawyer, and he had actively participated in a former hearing. He confirmed the trial judge's observation, "I understand that in the previous trial of this case when a portion of it was previously tried, you assisted in that case, too." Porter was in no sense overmatched by the attorneys for the prosecution, as demonstrated by the record, and we have been unable to perceive any abuse of discretion by the trial court in refusing to allow the motion for mistrial.

Errors in the admission of testimony are charged. Objections are not shown to have been interposed at the time the testimony was admitted and these alleged errors have not, in consequence, been properly preserved for review.

Complaint is made that the trial court erred in refusing to give certain instructions offered by the defendant. The first refused instruction was one on the requirement of proof of guilt beyond a reasonable doubt, the next four on the subject of circumstantial evidence and the last on the rules of law respecting the testimony of an alleged accomplice. We have examined these refused instructions, as well as those given, and find that the subject matter, taken in connection with the evidence, was fully covered by the instructions given. Repetition is unnecessary, and there was, hence, no error in refusing to give these instructions. *People* v. *D'Andrea,* 361 Ill. 526; *People* v. *Herkless,* id. 32.

Defendant contends, finally, that the verdict and judgment are against the weight of the evidence. The vital purpose to be achieved in offering proof of an alibi is to show that the defendant was elsewhere than at the scene of the crime at the time it was committed, thus rendering his participation impossible or highly improbable. When the evidence offered to establish an alibi, even though taken to be true, does not cover the entire period when the crime is alleged to have been perpetrated, the defense is not convincing. (*People* v. *Gasior,* 359 Ill. 517; *People* v. *Wynekoop,* id. 124.) Defendant's alibi does not purport to cover the period prior to 8:30 A. M. on the morning of March 30 and, according to Zakes' testimony, the defendant requested the deceased to be at his office at 8:00 o'clock. He admittedly left the operating room several times during the operation. His office was only about four blocks from the hospital. The two witnesses and the anesthetist present in the operating room who testified for the defendant, it may be fairly inferred, were more intent upon and interested in the progress of the operation than they were in the whereabouts of the defendant at any particular time during the morning. It is also clear that Zakes and the deceased called

on Dr. Neale two days before the alleged abortion and that he found her pregnant. From Dr. Neale's testimony it further appears that Zakes and the young woman desired to have an abortion performed on her. Defendant's office girl remembered the names of Marie Hansen and Mary Schwartz in connection with defendant's patients and there is, in addition, the corroborating testimony of Dr. Guy as to the condition in which he found Mary Schwartz. The testimony concerning the commission of like offenses was, of course, proper to prove criminal intent. *People* v. *Davis,* 362 Ill. 417; *People* v. *Hobbs,* 297 id. 399.

Much stress is placed by defendant upon the fact that the witness Zakes, by his own testimony, was, in law, an accomplice. The court, however, very carefully instructed the jury on the weight and value of the testimony of an alleged accomplice. A conviction will not be disturbed where the facts and circumstances testified to by the accomplice, when weighed and tested according to the applicable rules, are sufficient to prove guilt beyond a reasonable doubt, particularly, we have held, where there is evidence strongly tending to corroborate the accomplice's testimony. *People* v. *Karatz,* 365 Ill. 255.

The jury which found defendant guilty heard and saw the witnesses testify. A consideration of all the testimony fails to show the verdict was palpably contrary to the weight of the evidence. Under these circumstances, and where errors of law have not occurred which would warrant a reversal, we do not substitute our judgment for that of the jury.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SHAW, dissenting.