(No. 26084.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ERNEST C. MARTIN, Plaintiff in Error.

*Opinion filed April 15, 1941—Rehearing denied June 12, 1941.*

FARTHING and SHAW, JJ., dissenting.

DARROW, SMITH & CARLIN, (WM. W. SMITH, and WM. L. CARLIN, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error, Ernest C. Martin, was convicted in the criminal court of Cook county of murdering Anna Bilinski by abortion, and sentenced to the penitentiary for a term of fifteen years.

The indictment consisting of four counts was returned November 10, 1939. Each count charged murder by abortion performed on deceased on August 10, 1937. Some of the counts described the instruments alleged to have been used and others alleged the crime was committed by instruments or by means to the grand jurors unknown.

The errors here complained of are denial of a motion for continuance, refusal to require the People to elect on which count the cause should be tried, improper opening statement of the State's attorney, and rulings on the admissibility of evidence and in instructions to the jury.

As to the first contention the record shows that the case came on for trial on December 5, nearly a month after the return of the indictment. Defendant's counsel, who tried the case, appeared and secured a continuance to January 8, 1940, when a motion to quash the indictment was filed, assigning various grounds unnecessary to consider here, as error is not assigned on the ruling of the court overruling the motion to quash. A jury was selected and the case continued till January 9. Defendant's counsel

who tried the case filed the motion to quash and other preliminary motions. After the jury was selected and sworn and the case continued to January 9, defendant's counsel on that day moved for a continuance for ten days on the ground that defendant had hired another lawyer who was engaged in another trial, and he, the moving counsel, was not prepared to try the case. The court, observing that other counsel had not appeared at any time in the case, overruled the motion. As continuances from December 5 had been granted, the jury had been selected, and the record shows defendant's counsel was not overmatched in the trial, it was not error to overrule the motion for continuance.

Nor was it error to refuse to require the People to elect as to which count they would proceed on. All counts of the indictment charged but one crime, the difference being in the allegations as to the means or instruments used. The rule in this State is that an election will be required only where the offenses charged in the different counts of the indictment are actually distinct from one another and do not arise out of the same transaction. (*People* v. *Pulliam,* 352 Ill. 318; *People* v. *Pelinski, 293* id. 382.) No confusion could arise in the case before us from the different counts of the indictment.

Concerning counsel's contention that the State's attorney's opening statement was prejudicial, plaintiff in error's counsel point out several statements, most of which were not objected to, which, it is contended, were argumentative and presented alleged facts not within the scope of proper proof. The jury was instructed that opening statements were not evidence, and that the jury was to consider only evidence admitted. The State's attorney was twice rebuked by the court, not for statements made to the jury, but apparently because of his attempts to engage in colloquy with the court. We are unable to see wherein the defendant was prejudiced by the opening statement.

The People's witnesses consisted of John Bilinski, husband of the deceased, Dr. Warren Blim, whom the defendant called in before Anna Bilinski died, Dr. Jerry J. Kearns, coronor's pathologist, who conducted an autopsy on the body of the deceased, and John Griffin, an investigator for the State's attorney's office, who was present when the defendant first came to the State's attorney's office, on request, prior to the indictment, and who testified to conversations had between the State's attorney and defendant, in which the latter at first said he knew the deceased and her husband, but couldn't remember whether he had attended the former as her physician in August, 1937. He stated that he had known Dr. Blim for twenty years. This witness also testified that later, when a stenographer was brought in, defendant stated he did not know the Bilinskis or Dr. Blim and refused to answer any other questions without advice of his attorney.

The only objection here urged to the admission of testimony concerns that of the husband, John Bilinski. This witness did not speak English fluently and, at times, did not seem to understand questions put to him or remarks of the court concerning his manner of testifying. He testified that his wife Anna did not have a menstrual period in April or May, 1937; that about July 15 or 16, 1937, he, at plaintiff in error's office, told the latter that his wife was in the family way; was getting old; that they had five children and asked plaintiff in error if he could do something about it; that plaintiff in error said: "I will give you a prescription to the druggist for a certain kind of capsules;" that he had the prescription filled and gave the medicine to his wife and nothing happened; that on or about August 10, 1937, at the office of plaintiff in error, he, (the witness) told plaintiff in error that the capsules did not work and plaintiff in error told him to bring his wife to the office and he would open the womb that afternoon about 4:00 o'clock; that he took his wife

to the office of plaintiff in error who put some tools in a sterilizer and told the witness to turn his head the other way, not to look; that he, (the witness) was sitting at the end of the table; that plaintiff in error took a tool 10 or 12 inches long and put that into his wife's body; that the tool was like a scissors, like clippers or something, about ⅜ of an inch thick, and round; that plaintiff in error then put the tools aside and with some kind of cotton gauze wiped her out, and that that is all he saw. He further testified that plaintiff in error asked the witness and his wife to sign a slip of paper; that his wife tried but could not sign and that he signed his name; that he discussed the price for the operation and plaintiff in error told him it would cost $35 and that he gave plaintiff in error $20 and said: "If my wife be healthy I will give you the rest of this." He further testified that plaintiff in error took a quart bottle of Seagram's 7 whiskey from a drawer, filled two glasses, gave one to the witness and said: "Let's have a drink to the murder," and that tears were coming out of his (the witness') eyes at the time. He further testified that he took his wife home, she fixed supper and went to bed about 6:00 o'clock; that in the morning he saw a lot of blood on the bed and that it was coming from her female organs; that it continued to flow until the morning of August 11, 1937, when he called plaintiff in error on the telephone and told him his wife's condition; that plaintiff in error came to the house about 10:00 o'clock, examined Mrs. Bilinski and said: "That is the way it should be, don't be worried;" that plaintiff in error gave him another prescription which the witness had filled and gave to his wife; that after plaintiff in error left he found an unformed baby in the bed; that he, (the witness) put it in a quart fruit jar and filled it with alcohol; that he next called plaintiff in error on the afternoon of August 12 because his wife was still bleeding; that plaintiff in error came to the house a short time thereafter,

examined his wife, looked at her eyes carefully, and left some pills and went away.

According to the testimony of this witness, plaintiff in error came to the house each day and he, (the witness) called him every day, and on August 16 plaintiff in error gave her an injection in the arm; that from that day until his wife died he called plaintiff in error two or three times a day; that about 5:00 o'clock in the evening of August 20 his wife had kind of a stroke; that she grabbed him by the neck, kissed him, and said: "I got to die." This statement was stricken on motion. The witness also testified that plaintiff in error packed his wife's female organs with gauze and cotton to stop the blood, and told the witness he was going to call another doctor for consultation; that Dr. Blim came the evening of August 20 and removed the gauze from her female organs and caused a quantity of clotted blood to be ejected. He testified that plaintiff in error did not call an ambulance to take her to the hospital until the following Sunday and that she died before the ambulance arrived. He identified his wife's body in a casket at the county morgue on November 3, 1939.

Dr. Blim testified that on August 20, 1937, plaintiff in error asked him to see a miscarriage case with him. On arrival he found a woman bleeding from the vagina, with a moderate clot in her womb; that he massaged the clot abdominally, below the navel and the bleeding ceased; that he told plaintiff in error that ergotrate given intramuscularly would control the hemorrhage, and that the woman was not in a critical condition.

Jerry J. Kearns testified that he was a physician and surgeon, a pathologist for the coroner; that about 5:30 P. M. November 3, 1939, in his office in the county morgue in Chicago, a white metal casket was brought in containing the body of a female. Bilinski was there when the *post mortem* was started but not present during the actual posting of the body. He testified that he conducted an

autopsy and made a microscopic study of the uterus which indicated infection and a recent pregnancy. He found no infection in any of the organs except the uterus and that in his opinion Anna Bilinski died as a result of septicemia or blood poisoning arising in a recently·infected and recently pregnant uterus. On cross-examination he testified that the cervix or mouth of the womb was dilated but he could not say who opened it; that in his opinion, based on experience, the womb was dilated by an instrument; that a sound could have caused this particular dilation; that it might or could have been done in this case, and that was as close as he could come. His examination revealed that the foetus had been expelled; that this was not a spontaneous expulsion, and that if there had been a normal delivery there would not have been the evidence of infection in the lining and wall of the uterus.

Plaintiff in error's testimony was, in effect, as follows: That Anna Bilinski had been a patient of his for about eight years; that about the middle of July, 1937, John Bilinski consulted him about his wife's condition; that he suggested an examination and wrote out a prescription but did not remember the exact ingredients, but it was intended for a beginning menopause and could not have been used with any reasonable medical certainty in causing an abortion; that he next saw John Bilinski about the 8th or 10th of the next month. Bilinski told him his wife was no better and she was still suffering from aches and pains; that at the suggestion of plaintiff in error Bilinski brought his wife to the office in the afternoon, between 3:00 and 5:00; that he gave Mrs. Bilinski a routine examination; that he washed his hands, put on sterile gloves and inserted two fingers in the vagina with his other hand on her abdomen. Not being certain as to her condition, he took a speculum, a bi-valve instrument, sterilized it and inserted it in her vagina only for the purpose of examination; that he found a mass in her ab-

domen and a crooked uterus and a wide gaping cervix; that he did not know how it got there; that he did not use a dilator nor any metal instrument or other machine, tube, or device on her; that he did not use anything for the purpose of bringing about an abortion or causing a miscarriage; that he did not know she was about to miscarry or abort. He testified that Mrs. Bilinski called him the next day and on arrival at the house was told she had started to menstruate and that Bilinski told him she had passed a baby and that he had not heard anything about her having a baby up to that moment; that he did not know she was a pregnant woman about to have a baby; that he took the baby, left some pills for her to take and advised her to remain in bed and if she got any worse to let him know. When called a day or two later he found her complaining of pains in the chest, headache, slight cough and pains in her abdomen and she was still menstruating, so he left a prescription; that he subsequently called Dr. Blim who examined Mrs. Bilinski's abdomen and expelled a clot by massaging her abdomen; that Dr. Blim advised the foot of the bed be lifted and expressed that the pelvic condition was quite satisfactory and that the pneumonic condition was under control. Dr. Blim and he had a drink with Mr. Bilinski and left; that later Dr. Blim suggested he give her an injection of ergotrate H; that he got the drug and with his wife went to the Bilinski home and gave it to Mrs. Bilinski and while there his wife, Bilinski and he had a drink and a social conversation. The next morning he found Mrs. Bilinski's condition quite satisfactory, the hemorrhage had completely disappeared and she seemed in fair condition. He denied that he told Bilinski that if he brought his wife to the office he would open up her womb and that neither of them signed a paper in his office and he did not tell Bilinski it would cost him $35; that Bilinski paid him money on open account. He testified that a few minutes preceding Mrs. Bilinski's

death he went to a neighboring house and called an ambulance. When the ambulance came accompanied by a Chicago Heights squad car, Bilinski was there and made no complaint to the officers that anything wrong had been done by plaintiff in error or any doctor to his wife. On cross-examination, he testified he filled out the death certificate and gave as the cause of death "Influenza and Bronchial Pneumonia" and that the foetus he saw in the bottle was of a 2½ months' gestation. He denied that he told Dr. Blim when he called him in that he had a miscarriage case which was hemorrhaging. On re-direct he testified that he told Dr. Blim he had a patient that had pneumonia and that she had had a miscarriage and that he wanted him to take a look at her and see if everything is all right for him. He further testified that at the State's attorney's office, before a reporter was brought in, he told them he knew Mr. and Mrs. Bilinski, and after they threatened him he told them he refused to answer without the advice of his attorney.

During the examination of the complaining witness the trial judge admonished the complaining witness to testify from memory and to discard his notes. Counsel for plaintiff in error moved to withdraw a juror and declare a mistrial on account of prejudicial remark of the witness, *i. e.,* "She kissed me and said 'I am going to die'". In ruling on the motion, the court said: "I reserve ruling on the motion now, but if this witness keeps making statements of that kind, we will have to declare a mistrial and admonished the witness as to his testimony. At another time, after the court had sustained an objection and ordered the answer stricken, counsel for the People said: "Mr. witness, if she couldn't move, say she didn't move." The court: "Just ask your questions and don't instruct any more." A few questions later the following took place: "O never mind that, what did Dr. Martin do?" Mr. Holman: "That is objected to." The witness: "He skipped."

Mr. Sherwin: "If that happened in Dr. Martin's presence, certainly we don't have to withdraw it." Mr. Holman: "It is not evidence, if the court please." The court: "Just a minute, the next time a remark is made by you what you have to do or don't have to do we will declare a mistrial." The witness: "He skipped. He went out." Mr. Holman: "I move that answer 'He skipped' be stricken, your honor. It is a conclusion." The court: "Strike the remarks of the witness."

At the close of the direct examination of Bilinski, concerning the exhumation of his wife's body in 1939, plaintiff in error moved to strike all the testimony of the witness concerning that matter on the ground that no one has a right to dig up a dead body without an order of court. At the suggestion of plaintiff in error's counsel that the court reserve ruling on his objection until morning, the court reserved ruling on it and the record does not show that the court was asked to or that it ever ruled on the motion.

While we would not be justified in extending this opinion to an analysis of Bilinski's testimony here objected to as prejudicial, much of that claimed to be error was not objected to, and practically all the objections shown by the record were sustained and the testimony stricken. Plaintiff in error's counsel point out that Bilinski was an accomplice in the crime if one was committed and his statement is unworthy of belief. It is a familiar rule so often announced as to require no citation of authority that the testimony of an accomplice will be closely scrutinized and acted upon with great caution but it is sufficient to sustain a conviction, even where uncorroborated, if it is of a character to prove guilt beyond a reasonable doubt.

That Anna Bilinski died of a septic condition of the uterus due to an abortion is clearly established by the evidence of the autopsy, and is further supported by the testimony of Dr. Blim as to the condition he found. Plaintiff

in error's admission that a foetus had been discharged, which he took away, and the condition of the deceased before her death, must have shown him the infection was at least in the region of the uterus, yet he made out a death certificate showing death from pneumonia. We are of the opinion that no prejudicial error was committed in the admission of Bilinski's testimony.

Instructions are objected to. One of these was No. 25, which defined murder by abortion in the language of the statute. The complaint is that the indictment charged, and he was on trial for, murder by abortion, and the instruction in two places charges that whoever, by an attempt to procure or produce an abortion, and death of the mother ensues, shall be guilty of murder. In *People* v. *Heisler*, 300 Ill. 98, this court held that to cause a woman to abort or miscarry and to attempt to procure or produce an abortion or miscarriage are separate and distinct offenses, and that a conviction for murder by abortion would not be a bar to the prosecution of the defendant for murder by an attempt to produce an abortion. In that case the charge in the indictment was murder by abortion, and the proof clearly showed that no abortion was produced, and it was held that the variance between the charge and the proof was fatal. In *People* v. *Hagenow*, 334 Ill. 341, the same instruction was condemned in the same language as used in *People* v. *Heisler, supra.* It was also held that it is the contemplation of the law that the jury shall be instructed only concerning the crime of which the defendant stands charged. (*People* v. *Jones,* 263 Ill. 564.) In *People* v. *Rongetti,* 331 Ill. 581, the same instruction was condemned as erroneous and held to be prejudicial. In *People* v. *Rongetti,* 344 Ill. 278, this court again said the instruction should not have been given, but that there was nothing in it sufficient to warrant a reversal of the judgment. In the instant case, the instruction was not accurate, as the charge was murder by abortion and the proof was that an abor-

tion was in fact performed and not an attempted abortion. We are unable to see, however, where plaintiff in error was prejudiced by this instruction under the facts of this case. Instructions Nos. 8 and 9 instructed the jury in the words of the statute concerning malice, and the definition of murder.

Plaintiff in error, in support of his contention that it was error to give People's instructions Nos. 8 and 9, relies upon *People* v. *Schultz-Knighten,* 277 Ill. 238, a case of murder by abortion. The indictment in that case, as was the indictment in the instant case, was returned under section 3 of the Criminal Code. That section in full was set out in an instruction to the jury, and as in the instant case an instruction, section 140 of the Criminal Code, defining murder and express and implied malice, were given. In that case this court held the giving of the instructions defining murder and malice was reversible error and said: "Malice is not made by the statute an element of the crime for which the plaintiff in error was indicted, and the giving to the jury of the statutory definition of murder and repeatedly instructing them in regard to malice was confusing the crime for which she was on trial and the elements necessary to a conviction with the elements of another crime and was erroneous."

Defendant in error insists that, as the indictment in the instant case charges that plaintiff in error, "of his malice aforethought made an assault in and upon Anna Bilinski * * * did force, thrust and insert into the private parts," etc., *People* v. *Schultz-Knighten, supra,* is not in point, and that what this court said in *People* v. *Stilson,* 342 Ill. 158, is controlling. In the case last cited it was contended that an instruction like the wording of section 140 of the Criminal Code was erroneous, relying upon *People* v. *Schultz-Knighten, supra.* In passing upon that contention this court said: "The first five counts of the indictment in this case charge defendant with an attempt to produce an

abortion upon Miss Garner by means of thrusting an instrument or device into her private parts or womb, by reason of which attempted abortion she died. The sixth count charges defendant struck, penetrated and bruised Miss Garner with unknown instruments and inflicted upon her a mortal wound, of which she died. We are at loss to see how defendant could have been prejudiced by the giving of the second instruction."

The indictment in the instant case charged that plaintiff in error made an assault upon Anna Bilinski and unlawfully, feloniously, wilfully and of his malice aforethought did force, thrust and insert into the private parts and womb, and the crime charged was murder. We do not see how plaintiff in error was prejudiced by said instructions. If he performed an abortion upon Anna Bilinski, death having resulted therefrom, he was guilty of murder, and that was the charge in the indictment. Whether he did perform that operation or not, was a question of fact for the jury. The jury by its verdict found that he did perform the operation.

It is also argued that the jury's verdict cannot stand because the People did not offer proof that the abortion charged was not necessary in order to save the life of Anna Bilinski. If the People's testimony is true, it sufficiently established that the abortion performed was not necessary to save her life. In fact, the purpose of it clearly appears from the evidence to have been to prevent the birth of another child. This contention cannot be sustained.

While the record is not free from error, we are of the opinion no prejudicial error sufficient to justify this court in reversing that finding was committed.

The judgment of the criminal court is, therefore, affirmed.

*Judgment affirmed.*

FARTHING and SHAW, JJ., dissenting.