(No. 27248.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EMIL GLEITSMANN, Plaintiff in Error.

*Opinion filed Sept. 21, 1943—Rehearing denied Nov. 12, 1943.*

MILTON K. JOSEPH, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JOSEPH A. POPE, of counsel,) for the People.

Mr. JUSTICE FULTON delivered the opinion of the court:

Plaintiff in error was found guilty in the criminal court of Cook county of the charge of murder by abortion of one Marie O'Malley. The jury fixed the punishment at fourteen years in the penitentiary. Motions for new trial and in arrest of judgment were overruled. The defendant was thereupon sentenced and judgment entered upon the verdict by the court. The defendant prosecutes this writ of error to set aside the verdict and the judgment thereon.

The defendant, who was seventy-seven years of age, was a regularly licensed physician who had practiced his profession continuously in the State of Illinois since 1896 and maintained offices in the same building where he resided at 3940 North Monticello avenue, Chicago, Illinois. The deceased was a widow who was living with one Fred Dempsey, a married man at the time who had children of his own living with his wife. He likewise was the father of one of the children born unto Marie O'Malley.

Dempsey testified that on December 5, 1941, he, together with Dorothy Salvesen, a cousin of Mrs. O'Malley, and Mrs. O'Malley, went to the office of the defendant. The following evening the three again visited the defendant, Mrs. O'Malley remaining in the examining room about a half hour. Dempsey asked the doctor how things were going and was told everything was going all right, the doctor saying that Mrs. O'Malley was pregnant only a few

months and that she would have to massage her abdominal muscles and rest in bed from three to five days at home; that around the fourth or fifth day she would start getting severe pains. The doctor stated that he had had to pack the deceased, which packing was to remain in until the next evening. On December 7 Dempsey and Mrs. O'Malley again returned to the doctor and upon emerging from the treatment room the doctor stated everything would be all right and told Dempsey about certain exercises which Mrs. O'Malley was to indulge in, such as raising the knees up to help the abdomen throw off the baby, which exercises the doctor stated would help along the operation. On December 8 Dempsey again accompanied Mrs. O'Malley and had another conversation with the doctor wherein the doctor stated it was too bad that things like that had to be performed and that a woman who did not want to become pregnant should have something done to her; that in about two weeks time he would fix her up so she would never get pregnant again. On the evening of December 9 Dempsey stated that Dorothy Salvesen again accompanied him and Mrs. O'Malley to the doctor's office. The defendant stated everything would be O.K. and that nothing was wrong and for Dempsey not to worry; that the deceased would be properly taken care of and that there was absolutely no danger of blood poisoning or infection of any kind. Mrs. O'Malley at this time stated she was holding her chin up and fighting hard to see that everything came out all right. Dempsey further stated that Mrs. Salvesen stayed at the office until 9 o'clock and left after the doctor had told her and Dempsey it was unnecessary for either of them to remain because everything was properly taken care of; that about every fifteen or twenty minutes he walked back into the treatment room and saw Mrs. O'Malley lying on a cot, the doctor sitting alongside of her; that he walked in and out of this room

approximately twenty times and saw the deceased roll over on her side while the doctor rubbed her back; that Dempsey asked why the deceased was screaming and hollering, the doctor answering that it was just like childbirth and that all the stuff in her had to come out; the bed was full of blood and the defendant was injecting his hand into the deceased's womb and was pulling chunks of blood out of her with his bare hands. The doctor also had a metal instrument in his hand and told Dempsey he thought he would have to scrape her so that blood poisoning would not set in. The doctor wrapped the chunks into a piece of paper and disposed of them. About 11 o'clock of that evening Dempsey suggested taking the deceased to a hospital, but the defendant advised against it because if she went to a hospital she would most certainly develop blood poisoning. About 4:00 o'clock in the morning of December 10 Dempsey went home to look after the children and returned about 8:00 o'clock. The patient was still lying on the cot and asked Dempsey to take her home. He again suggested a hospital but the doctor told him to take the deceased home and that she would be perfectly well in a day or two since the afterbirth had come out. The doctor gave Dempsey a blood builder for the deceased. After the deceased arrived at her home, a doctor was called and shortly thereafter Dempsey called another doctor. Mrs. O'Malley died about 10 o'clock the same morning. The defendant arrived shortly after the other two physicians and, upon being informed that Mrs. O'Malley was dead, said he could not understand how it could happen and that he would sign the death certificate.

Dr. Lehner testified he arrived about 10:00 o'clock and Mrs. O'Malley died very shortly thereafter; that the defendant told him he would furnish a death certificate and asked Dr. Lehner what he was going to do about it, Dr. Lehner answering he was going to report the matter to the coroner.

Dr. Samuel A. Levinson, chief pathologist of the coroner's office, testified that upon performing an autopsy he found a reddish discoloration over the chest and abdomen, found colostrum which is indicative of pregnancy and upon examination of the uterus concluded that Mrs. O'Malley died as the result of Welchi bicillus infection, associated with a recent pregnant uterus.

The State introduced the testimony of Pearl Katschke and Edith Hagebush, both of whom went to the defendant and upon whom the defendant performed abortions. Both of these acts took place during 1941 and 1942. Each described a treatment performed upon her quite similar to the treatment the defendant admitted performing upon the deceased.

Dorothy Salvesen testified that she accompanied Mrs. O'Malley to the defendant's office on the evening of December 5 and waited for her while the doctor made an examination in the treatment room; that the doctor asked Mrs. O'Malley why she came and she answered "pregnancy." She again accompanied the deceased on the second evening and heard the deceased say she was not feeling good, whereupon the doctor stated she would feel better after that night; that it was the proper time. She saw the defendant the third time on December 10 after Mrs. O'Malley had passed away, the defendant stating he could not do anything about it because the baby was decomposed when it came out.

In a statement taken of the defendant on December 10, 1941, in the State's Attorney's office, the defendant stated that he practiced healing called Therapeutics consisting of light, electricity and massage; that when Mrs. O'Malley came to him there was no discussion whatever about pregnancy nor was anything said about indication of pregnancy. Mrs. O'Malley told him she did not want any other children, but he had no discussion whatsoever concerning any sex relations or possibility of pregnancy. Dempsey

was with her at the time and accompanied her upon every examination. The first examination showed an inflammation around the neck of the womb, together with an exuding of poison. A bluish color indicated a congestion to him. He noticed an elongated lump quite hard and sensitive up under the navel and concluded that Mrs. O'Malley was suffering from cancer. In this statement he denied inserting anything into the opening of the uterus or going into the uterus with instruments, hands, cotton or gauze at any time. On the evening of the ninth he stated Mrs. O'Malley had pains all over her body and was discharging a tar-like substance, which was decomposed blood and which in his opinion came from the poisoning of the blood in the womb where the foetus was. The foetus was all decomposed. He did not, however, at this time discuss with Mrs. O'Malley as to whether she might be pregnant, but said that evidently it was a miscarriage. At 8:00 o'clock in the morning on the tenth Mrs. O'Malley was in a much better condition. The discharges which she was having told the doctor what he had suspected in the beginning, namely, a poisoning, but he denied that his treatments had killed the foetus in her, further saying that the foetus must have lain there for two or three weeks and could not decompose in three days. The doctor admitted advising against hospitalization since the hospital could not give her the relief that he could give her. In substance the statement as to the number of visits and the occurrence on the morning of the tenth at the home of Mrs. O'Malley was corroborated by him.

The defendant testified in his own behalf and stated that upon his first examination he found a pronounced peritonitis; that on this examination Mrs. O'Malley told him she had not been menstruating and felt bad. He found upon internal examination a foul-smelling pus matter running from the vagina and told Mrs. O'Malley she was suffering from blood poisoning, which he could cure. Demp-

sey was with her the first night and on each and every visit she made to his office. He treated her with electric heat and vibrations and cleaned her out on December 6 and 7, and on December 8 removed the packing which he was using and again cleaned her out, using the same treatment. On the evening of the ninth he kept her at his house all night, since she was in such great pain and had so much difficulty in breathing, but she walked to the car alone upon leaving his office. When he arrived at Mrs. O'Malley's home on the morning of the tenth he found she was dead. The defendant also testified no one asked him to perform an abortion and that he would refuse to do so. He likewise denied performing any abortion on Pearl Katschke and Edith Hagebush; that with reference to the latter she was discharging a bloody pus matter when he first saw her and she had told him she had been taking ergot and quinine. In his examination the defendant stated he did not wear gloves during his examinations since they are only for the protection of the physician and because he needs his sense of feeling when he examines a patient.

It is the contention of the plaintiff in error that the evidence considered as a whole fails to establish the guilt of the defendant beyond a reasonable doubt, and that there was an utter failure of proof that the death of Marie O'Malley was caused by any act done or operation performed by the defendant.

We do not consider it necessary or good taste to review all of the testimony heretofore detailed in this opinion. Upon the testimony offered by the State there is sufficient upon which the jury could have returned a verdict of guilty of murder by abortion. Much of the testimony offered by the State and that offered by the defendant is in agreement. As to the commission of an abortion it was merely a matter of believing either the defendant or the witnesses for the State. We have many times held heretofore that in a criminal case it is the peculiar province

of the jury to weigh the evidence and determine the facts, and that the court will not reverse a judgment of conviction on the ground the evidence is insufficient to sustain the finding of guilt, unless there is a reasonable and well-founded doubt of the guilt of the accused and the verdict is found to be palpably contrary to the weight of the evidence. *People* v. *Booker*, 378 Ill. 334.

The State submitted the testimony of Pearl Katschke, upon whom it was claimed the defendant performed an abortion during October, 1941, and of Edith Hagebush, upon whom it was claimed the defendant performed an abortion in March, 1942, for the purpose of showing the intent of the defendant.

In *People* v. *Schultz-Knighten*, 277 Ill. 238, it was said: "Though a single abortion may have been committed for a sufficient reason and with no criminal intention, repeated acts of that character may create a reasonable presumption that they were not done to preserve life or ignorantly, but with criminal intent and knowledge, and the more numerous the acts, the stronger, ordinarily, will be the presumption."

The contention of the defendant that the version of peritonitis is the only logical and reasonable explanation of the death of Marie O'Malley is quite inconsistent with the statements made by the defendant about an operation and exercises to throw off the baby.

The defendant also contends that the proof of the alleged abortion is based entirely upon the testimony of two accomplice witnesses, whose testimony is inconsistent and unworthy of belief. A review of the record shows that the defendant, in the instant case, was ably and well represented, and the jury was thoroughly and properly instructed as to the weight and credibility to be given to accomplice witnesses. The jury was in a position to see and hear the witnesses who were claimed to be accomplices and had a right to decide under proper instructions the

weight to be assigned to the testimony of these witnesses. (*People* v. *Mitchell,* 368 Ill. 399; *People* v. *Gleitsmann,* 361 Ill. 165; *People* v. *Martin,* 376 Ill. 569.) Applying the rule laid down in those cases to the instant case, it is impossible to find any merit in the contention of the defendant.

The defendant also contends that the giving of People's instruction 1 was error. This instruction reads as follows: "The court instructs the jury that if you find from the evidence in this case beyond a reasonable doubt that Marie O'Malley was pregnant with child and that she aborted or miscarried from an operation upon the private parts of her body, from which death ensued, and that the said operation was performed, with an intent to cause an abortion or miscarriage by the defendant Emil Gleitsmann, or by any person acting under defendant's direction, or if the defendant aided, abetted and encouraged the operation in any manner, and that the said operation was not done as necessary to preserve the life of Marie O'Malley, then in such case the court instructs you that as a matter of law, the defendant is guilty of murder in manner and form as charged in the indictment."

Examination of the cases indicates that this instruction has been given on several occasions and in each case was condemned as an improper instruction, where there was no proof that the defendant "aided, abetted and encouraged." In the case of *People* v. *Zwienczak,* 338 Ill. 237, although the court condemned the use of the instruction, still it was said, at page 242, "we are of the opinion that the giving of this instruction did not constitute prejudicial error." Likewise, in *People* v. *Rongetti,* 344 Ill. 278, this court again said the instruction should not have been given but there was nothing in it sufficient to warrant a reversal of the judgment. The same view was taken in the case of *People* v. *Martin,* 376 Ill. 569, nor do we find anything in the instruction in the instant case to change our view

thereof. We have heretofore stated the rule to be that unless an instruction is of such a nature as to have resulted in injury to the defendant, the fact of having given it is not ground for reversal. *People* v. *Sink,* 374 Ill. 480.

Defendant's last objection is that the rights of the defendant were greatly prejudiced by the conduct and argument of the State's Attorney in referring to the defendant as a "quack," in referring to the testimony of Pearl Katschke and in remarking about the inability of Mrs. O'Malley to be present, saying "She cannot give us her version of what happened. She can't tell us about that lonely night that she spent in this fellow's office; that part of the prosecution is missing; it lies to-day in the grave of the woman whose murder he is accused of." It is true that if the argument of the State's Attorney prejudices the cause of the defendant, it is a good ground for reversal, but arguments and statements based on the facts appearing in the proof or on legitimate inferences deducible therefrom, do not transcend the bounds of legitimate argument. In *People* v. *Hagenow,* 236 Ill. 514, at page 543, in quoting *Crocker* v. *People,* 213 Ill. 287, it was said, "It is not improper for a prosecuting attorney to reflect unfavorably on defendant or denounce his wickedness, and even indulge in invective, if based upon evidence competent and pertinent to be decided by the jury." We do not by this mean to countenance the statement of the State's Attorney in referring to the defendant as a "quack." However, from our examination of the evidence, we do not believe this improper remark reflected upon the defendant so as to influence the jury in its verdict or resulted in prejudice to the defendant, nor do we think that the result of the trial would have been changed by the omission of the remarks complained of.

For the reasons above stated, the judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*