# CHRISTOPHER RAFFERTY

## v.

# THE PEOPLE OF THE STATE OF ILLINOIS.

1. CHANGE OF VENUE—*matter of right, in a capital case.* An application for a change of venue by one indicted for murder, is not addressed to the discretion of the court, but, upon a proper application being made, the prisoner is entitled to it as a matter of right.

2. CRIMINAL LAW—*killing an officer when making illegal arrest, not murder, but manslaughter, unless there be previous or express malice.* If a public officer be resisted and killed by a person whom he is attempting to illegally arrest without color of authority of law, the killing will be manslaughter only, unless the evidence shows previous or express malice.

3. SAME—*warrant, when void.* Where a justice of the peace signs a number of blank warrants, and, in his absence, a police sergeant fills out one of them and inserts the name of a person, as a defendant, such warrant is void, and will not afford even color of justification for the arrest of such person.

4. If an officer be resisted and killed by one whom he is illegally attempting to arrest, and it appears that the party who does the killing was actuated by previous or express malice in so doing, such killing is murder, notwithstanding the illegality of the attempted arrest.

5. SAME—*new trials in criminal cases—when granted.* If, when the evidence is all carefully considered and weighed, in a criminal case, it appears that it is wholly wanting in respect to some necessary element of the crime, or if there is a conflict of evidence, and there is such a clear preponderance against the verdict as to suspend the judicial mind in serious doubt as to the guilt of the accused, then, in either case, a new trial should be granted.

6. Where a conviction rests solely upon the evidence of an accomplice, if the jury choose to believe him, the court could not reverse, where that fact was the only one affecting his credibility, although it might believe that faith should not be reposed in such a witness. But, where a verdict rests solely upon the evidence of a single witness, and direct evidence of impeachment is introduced to such an extent as to lead to the conclusion that the jury were actuated by passion or prejudice in disregarding such impeaching evidence, then the court ought to set the verdict aside, and direct a new trial.

7. EXPRESS MALICE. Where a party procures a weapon for the express purpose of resisting an arrest, whether legal or illegal, by a particular officer or by one of a particular class of officers, and such officer attempts

to arrest him, and, before any violence is done or offered to him, he kills such officer with the weapon thus provided, the jury will be justified in finding that he was actuated by previous or express malice, and the killing is murder, notwithstanding the attempted arrest was illegal.

8. INSTRUCTIONS—*should not caution jury against giving credence to the evidence of a designated witness.* It is not proper for the court, in a criminal case, to designate the evidence of a witness who is not an acknowledged accomplice, and caution the jury against giving credence to it. Casting the influence of the court against the testimony of a particular witness, or the character of the evidence he gives, is not the usual way of either affecting the credibility of witnesses or the weight of testimony.

9. EVIDENCE—*as to testimony of a witness on a former trial.* Evidence as to what a witness may have sworn to on a former trial, is only competent for the purpose of affecting the credibility of such witness, and can not be used to prove the facts previously sworn to.

10. Where the defense, on an indictment for murder, is, that, at the time of the killing, the deceased was assisting an officer in illegally arresting the defendant, the burden of proving that fact is on the defendant, and evidence that the officer, on a former trial of the case, testified that the deceased was so assisting him, is not competent to prove the fact, but is only competent so far as it affects the credibility of the officer, when, on another trial, he testifies that such was not the fact.

11. PRACTICE—*judge communicating with the jury from his lodgings.* When the court adjourns, the judge carries no powers with him to his lodgings, and he has no more authority over the jury than any other person, and any direction to them, from him, either verbal or in writing, is improper.

12. If the judge sends from his lodgings a message to the jury, of a character to probably operate to the prejudice of the accused, the fact that his counsel, in his absence, consented to it, would not, in a capital case, cure the error. Yet, if by no possibility it could work an injury to the prisoner, it ought not to vitiate the verdict.

WRIT OF ERROR to the Circuit Court of Lake county; the Hon. T. D. MURPHY, Judge, presiding.

Mr. E. A. SMALL, for the plaintiff in error.

Mr. CHARLES H. REED, State's Attorney, for the People.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

This case has been before us, upon writ of error, on two former occasions.  On the first, the conviction was reversed upon the ground that the Criminal Court of Cook county erred in denying the prisoner's application, upon a sufficient petition, for a change of venue.  This court held, in accordance with the views of the profession and circuit judges all over the State, as shown by the general course of practice, that the application was not addressed to the discretion of the court, but, upon a proper application being made, the prisoner was entitled to it, as a matter of right.  For depriving him of that right, the judgment of the court below was reversed and the cause remanded.  *Rafferty* v. *The People,* 66 Ill. 118.

Upon the second trial, in the county to which the venue was changed, evidence was given by Scanlan directly tending to show that he and O'Meara, the deceased, at the time the latter was shot, were attempting to arrest the prisoner upon a warrant, not in the hands of O'Meara, but Scanlan.  Whereupon, the prisoner's counsel gave evidence showing, without contradiction, that the pretended process upon which such arrest was attempted, was a blank taken from a number which the police magistrate had signed in blank, and which, on August 4, 1872, had been filled out by a mere police sergeant, in the absence of the magistrate, by inserting the prisoner's name, but dated as of August 5, 1872.

When the evidence of the illegality of the process was given, the court, on motion of the State's Attorney, excluded it from the jury, to which the prisoner's counsel excepted.  This evidence having been excluded, the case was then submitted to the jury by the court below, upon the ordinary presumption of implied malice, and as if no such element as an illegal arrest being attempted at the time of the homicide, was in the case.  The prisoner was convicted of murder, and

sentenced to suffer the penalty of death.  An application was made, upon a transcript of the record preserving the evidence and rulings of the court, for the allowance of a writ of error from this court, which was granted, and that brought the case before us a second time.  As the case then stood, not having been submitted to the jury upon the question of express malice, and the evidence tending to show O'Meara's participation in an attempted arrest, and the evidence excluded showing that the supposed warrant on which the arrest was being made did not afford even the color of justification, because it was not issued in the course of justice at all, but fabricated by a mere police sergeant, we could not pass upon the merits of the case, because a portion of the evidence affecting the merits had been excluded.

It is true, the fact of the homicide was established beyond doubt, but every killing of a human being is not necessarily murder.  The character of the act depends upon the attending circumstances.  The propriety of the ruling of the court in excluding that evidence was therefore before us, and we could not escape its decision.

We held, as we have no doubt, properly, and in accordance with all the decisions in England and this country, that, if a public officer be resisted and killed by a person whom he is attempting to illegally arrest, without color of authority of law, the killing will be manslaughter only, unless the evidence shows previous or express malice.  *Rafferty* v. *The People,* 69 Ill. 111.

As we have before said, as the case was then presented, there was evidence clearly tending to prove O'Meara's participation, and the evidence excluded would have shown the warrant utterly void, as we have stated ; then it followed, upon principle and authority, that the exclusion of the evidence was wrong, was prejudicial to the legal rights of the prisoner.  For, when it appeared that a question could be properly raised as to the legality of the arrest which Scanlan was undoubtedly attempting to make, and the evidence tended

to show deceased was aiding him, the obvious and proper
course was, to let the excluded evidence go to the jury, and
they be required, by the directions of the court, to find whether
deceased was in fact participating in an attempted arrest by
Scanlan under the supposed warrant, if such were the facts; and
then told that, if the prisoner resisted such illegal arrest, and
committed the homicide, it was manslaughter only; but if he
was actuated by previous or express malice, it would, never-
theless, be murder. This was the only proper course to have
been pursued by the court below, and the departure from it
was so plain a departure from established principles of crim-
inal jurisprudence, that we, as a court of last resort, could
not do otherwise than reverse the conviction and direct a new
trial. In the opinions then filed, it was announced, if, when
the question was made a direct issue in the cause, as to whether
O'Meara was, in fact, participating with Scanlan in an at-
tempted illegal arrest, it should be found that he was not, the
rule laid down would not apply; or if, on the other hand, the
evidence should show express malice, then it would be murder
at all events.

The case was sent back under these rulings. and again tried,
with the same result as before. A transcript of the record,
duly certified, with an assignment of errors, was presented in
vacation, for the allowance of a writ of error. It was allowed,
and the case is now before us for the third time.

The evidence as to the illegality of the supposed warrant
was admitted on this trial, and it was made a direct issue in
the cause, whether or not O'Meara was participating in the
arrest, and whether the prisoner was actuated by previous or
express malice.

The prisoner's counsel earnestly insists that the evidence
would sustain a conviction for manslaughter only, and that
this court should revise the finding of the jury upon the evi-
dence, and set it aside. It is true, the statute has clothed
this court with a revisory power over the verdicts of juries in
criminal as it has in civil cases; and it is also true, that there

is some difference between the two classes of cases, for, in criminal cases, the guilt of the accused must be established beyond a reasonable doubt, while, in civil cases, the issue is determined by a preponderance of evidence. In the latter class, it is the established rule, if the verdict is wholly unsupported as to any necessary element, or if there is evidence upon both sides, and the verdict appears to be manifestly against the clear weight and preponderance of the evidence, we set it aside. In criminal cases, this court has, as yet, established no fixed, definite rule, and it is doubtful if any can be established farther than this: If, when the evidence is all carefully considered and weighed, it appears that it is wholly wanting in respect to some necessary element of the crime, or if there is a conflict of evidence, and there is such a clear preponderance of evidence against the verdict, as to suspend the judicial mind in serious doubt as to the guilt of. the accused, then, in either case, we ought to grant a new trial.

Questions of the credibility of witnesses are peculiarly for the jury. As, for instance, suppose the conviction rests solely upon the evidence of an accomplice. If the jury choose to believe him, we could not reverse when that fact was the only one affecting his credibility, although we may believe that faith should not be reposed in such a witness. But, when a verdict rests solely upon the evidence of a single witness. and direct evidence of impeachment is introduced to such an extent as to lead to the conclusion that the jury were actuated by passion or prejudice in disregarding such impeaching evidence, then we ought to set the verdict aside, and direct a new trial. We are satisfied that, under no rule which ought to govern, in reviewing the verdicts of juries in criminal cases, upon the evidence, can we consistently interfere in this case. The evidence is different from what it was when the case was last before us; it fails to show that deceased was, in fact, participating in any degree in an attempt by Scanlan to arrest the prisoner upon the supposed warrant. But it is said Scanlan

has committed perjury, in testifying as he did; that his tes-
timony on the former trial was introduced, from which it
appears that deceased was standing against the door, with a
slung-shot suspended from his wrist, to prevent egress by
the prisoner from the room, and was thereby assisting. It is
true, such evidence was introduced, but that evidence only
tended to affect the credibility of Scanlan, was competent for
that purpose only, and could not be used to prove the facts
previously sworn to. This was a part of the prisoner's de-
fense, to be established by him. The question of Scanlan's
credibility was for the jury, and the evidence opposed to him
was very slight.

But there is another view of the evidence which would
entirely override the question of illegal arrest, or O'Meara's
participation in it, and that was the evidence of previous or
express malice. Only some three days previously. the prisoner
declared. in substance, that no Bridgeport policeman should
arrest him while he had a pistol. It appears that, although
finding him in the saloon was a matter of pure accident, he
was already prepared with the very weapon alluded to in his
threat. These officers were Bridgeport policemen, and it
appears that he did not use it upon the deceased merely be-
cause he was preventing his egress from the saloon, but when
he had shot him through the breast, then, without offering to
go out of the door, he instantly turned around and fired two
shots at Scanlan, who was back of him, and had no agency
in preventing egress from the room, either by personal vio-
lence or constructively, by guarding the door.

In *Rex* v. *Patience*, 7 Carr. & Payne, 775, the prisoner was
indicted for stabbing William Beechy. It appeared, upon the
trial before Parke, B., that John Beechy was a constable of
Witney, and had a warrant for the apprehension of the pris-
oner. He employed his two sons to take him. The sons, one
of whom was William, went in pursuit of the prisoner, while
the father stayed behind. They found him lying under a
hedge about a mile from Witney. He had an open knife in

his hand, which he was running into the ground. William laid hold of him while his father was in sight, about a quarter of a mile away. Parke, B.: "That was not a lawful arrest. You had better examine as to whether he had prepared the knife before the witness took him by the collar." The witness then stated: "The prisoner said that, if I did not let him go, he would cut my fingers off; he stabbed me with the knife; when I first came up, he had the knife in his hand, and was running it into the ground; he had got up from the ground to run away; I had collared him before he wounded me, but not before he had begun to run away; I first saw him a quarter of a mile off, and he was then running the knife into the ground."

Parke, B.: "The arrest was illegal, as the father was too far off to be assisting in it, and there is no evidence that the prisoner had prepared the knife beforehand, to resist illegal violence. If a person receives illegal violence, and he resists that violence with any thing he happens to have in his hand, and death ensue, that would be manslaughter. If the prisoner had taken out this knife on seeing the young man come up, it might be evidence of previous malice; but that is not so, as we find that the knife was in his hand when the young man first came in sight. The prisoner must be acquitted."

Now, this case, though not parallel in its facts, illustrates the principle, for there is no difference upon the question of previous malice between the fact of taking out the knife, upon seeing these young men approach, and that of the prisoner providing himself with a pistol for the purpose of resisting any arrest, whether legal or otherwise, attempted by Bridgeport policemen.

It is true, that evidence of a threat previously uttered, is a kind of evidence which, under many circumstances, ought to be received with caution. Still, when that is taken in connection with the undisputed facts, that the prisoner had provided himself with a pistol, and no other reason is shown for his doing so, and that he used it in the manner stated, before any

violence was done him by either of the policemen, the threat seems natural, and no other conclusion can be arrived at, than that of previous or express malice. We think the jury were entirely justified, by the circumstances in evidence, in so finding.

There is no assignment of error for the giving of instructions on behalf of the people, but we have examined those given, and think they correctly presented the law of the case to the jury. Complaint is, however, made, and error assigned for the refusal by the court of the 12th instruction asked on behalf of the prisoner. It is as follows:

"12. On the question of express malice, the court instructs the jury that the alleged declaration of a person accused of crime, should be received with extreme caution by them. in a case involving the life of a fellow creature. In this spirit, the jury are enjoined by the court to pass upon and determine the just weight to be given to the testimony of the witness, Bedell, relative to the alleged declaration of the defendant to said witness on Friday, the 2d of August, 1872. This caution should be more especially observed, if the jury find, from the evidence, that there is no other testimony in the case which tends to show express malice on the part of the defendant towards said O'Meara."

We think this instruction was properly refused, on the ground that it would trench upon the province of the jury. If the undisputed facts of the case tended to show, independently of any threat, a previous determination on his part to resist any attempt of Bridgeport policemen to arrest him, and the preparation of a pistol for the purpose, the threat was a natural one, and we are unable to perceive any reason why the truth of the fact of his having made such a threat should not be considered in connection with the other evidence, without any injunction from the court to receive the evidence of the threat with extreme caution, the same as the truth of any other fact in the case.

It is a general rule of evidence, that alleged declarations, made by a prisoner out of court, should be received with extreme caution. But sometimes they are made with such deliberation and freedom from extraneous influence, as to amount to evidence of the most satisfactory character. We are disinclined to recognize the right of the court to designate the evidence of a witness, who is not an acknowledged accomplice, and caution the jury against giving credence to it. If it could be properly done in case of a witness for the people, it could also in that of a witness for the accused. Casting the influence of the court against the testimony of a particular witness, or the character of the evidence he gives, is not a usual way of either affecting the credibility of witnesses or the weight of testimony.

The only remaining point we deem worthy of consideration, arose upon the motion for a new trial, and was based upon an alleged improper communication made to the jury by the deputy sheriff in charge, whilst they were deliberating upon their verdict. It appeared, by the affidavit of such officer, that, on Wednesday evening, November 26, after the jury had been out about eight hours, the officer was sent for by the presiding judge, who was then at his hotel, and instructed by him to inform the jury that he would meet them at 7 o'clock the next morning, being the 27th; that deponent understood the judge to say to him that he, the judge, regarded it as his privilege to adjourn until the following Monday morning, and to so inform the jury; and he states that he did so inform the jury; that it was his understanding, and he *believed* the jury also understood, that unless a verdict was rendered by 7 o'clock the next morning, the jury would be kept together until the ensuing Monday; that the jury finally came to an agreement within a very few minutes to 7 o'clock the ensuing morning, and deponent *knows* that such agreement of the jury was hastened by the knowledge on the part of the jury that, unless they agreed, they would be kept together for several days longer.

It appears by the record that, at about 9 o'clock P. M. of the 26th day of November, 1873, while the jury were deliberating in their room, the judge of said court, with the consent of both the State's Attorney and the counsel for prisoner, sent word to the jury, by the officer in charge, that he would meet the jury at 7 o'clock the next morning, said judge being at the time at his lodgings, and the prisoner not personally present.

It has been held by a court of the highest respectability, that, when the court adjourns, the judge carries no powers with him to his lodgings, and has no more authority over the jury than any other person, and any direction to them from him, either verbal or in writing, is improper. *Sargent* v. *Roberts et al.* 1 Pickering, 337. This is doubtless sound and judicious doctrine.

If the words sent by the judge from his lodgings were of a character to probably operate to the prejudice of the accused, the fact that his counsel, in his absence, consented to it, would not, in a capital case, cure the error. Although the message was improperly sent, yet, if by no possibility it could work an injury to the prisoner, it ought not to vitiate the verdict. The message, *as sent*, would be understood by the jury as simply showing a proper consideration for their comfort, by lessening the time of their confinement. It was sent at 9 o'clock in the evening of the 26th, and merely assumed that they might agree within ten hours. With sensible men, of whom the jury are presumed to have been composed, this could not hasten their verdict. *McIntyre* v. *The People*, 38 Ill. 514.

If this were all, the question would be free from difficulty. But as one irregularity is likely to lead to others, so here, the officer went beyond the scope of the message sent, and informed the jury that he understood the judge as saying that it was his privilege to adjourn court until the next Monday morning; that he so told the jury, and he knew it hastened their agreement to a verdict.

The 27th of November was Thursday, and Thanksgiving day. It was the expectation that they would be kept together until the next Monday morning, if they did not agree by 7 o'clock Thursday morning, which is supposed to have had the effect of hastening the verdict. This communication on the part of the officer was highly improper. We are unwilling to give the slightest sanction to such practices, and, this being a capital case, if the evidence of guilt had been less clear. in any substantial degree, we should not hesitate to set the verdict aside. on account of the probable prejudice the message might have occasioned by hastening the verdict of the jury. But here, all legal evidence offered by the accused had been admitted ; the fact of the commission of the homicide by the prisoner, and the attending circumstances, were uncontroverted, except merely as to the extent to which the deceased was participating in the attempt by Scanlan to make an arrest. which, although illegal, had not proceeded to any violence on the part of the officer. There was evidence as to the attending circumstances and previous threat, wholly uncontradicted, which strongly tended to show previous or express malice ; indeed, the inference of such malice, as the record now stands, is almost irresistible. This was the third trial of the case, with the same result each time. Neither the prisoner nor his counsel can have any just cause of complaint, that this cause has not received, at the hands of this court, all the patient attention and careful consideration demanded by the great and solemn issues involved. Absolute exemption from error is unattainable. There has been no error, in respect to the bringing the whole scope of the case before the jury. They, after considering it 18 hours, returned the verdict they did. The prisoner's counsel had the right to poll them, but did not see fit to do so.

Under the circumstances, we do not feel it our duty to set the verdict aside for the irregularity indicated, and must affirm the judgment.

*Judgment affirmed.*

Mr. JUSTICE SCOTT, dissenting :

I joined in granting a *supersedeas* in this cause, on the ground a fatal irregularity occurred at the trial in permitting the officer having charge of the jury to carry to them a message purporting to come from the judge of the court. After more mature reflection, I find no reason to change the judgment then deliberately formed.

The law is well settled, the judge, at his lodgings, has no control over the jury, and that it is improper for him to send them any communication, no matter what its character may be. If it becomes important, for any reason, to communicate with them, they should be brought into open court, in the presence of the parties. Any other rule is liable to great abuse.

Whether the officer in this instance obeyed his instructions or not, is wholly immaterial. The message delivered to the jury was given as coming from the judge, and was, no doubt, received in that belief. The effect, therefore, was the same had the judge in fact sent the identical message delivered by the officer.

It is conceded, in the opinion of the majority of the court, it was grave error that such a communication was given to the jury. Whether it was sent by the judge or not, that can not be palliated or tolerated in the proper administration of the law. But the judgment is affirmed on the ground the evidence shows the accused was guilty beyond a reasonable doubt. This does not answer the whole objection. The conclusion would be more logical, and could be more easily maintained, if the punishment in such cases was absolutely fixed by law. Such is not the case. Under our statute, in all capital cases, the jury are invested with a discretion to say what the punishment shall be—whether it shall be death by hanging, or imprisonment for life in the penitentiary.

The evidence in the record leaves no room to doubt the jury were hastened in their finding by the message delivered

4—72D ILL.

to them by the officer.   In view of the fact the measure of the punishment to be inflicted, in case of conviction, was in the discretion of the jury, who can say they were not hastened in their verdict to the prejudice of the accused?   It is the right of every one charged with crime to have the calm and deliberate judgment of the jury selected to try his cause, and the fact their deliberations may have been unduly influenced by any cause whatever, is error so prejudicial, in a case like this, that it ought to be a ground for the reversal of the judgment. It is not a mere irregularity.   It may have injuriously affected the merits of the case.

For the reasons indicated, I feel constrained to enter my dissent to the judgment about to be pronounced.               •