(No. 26796.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NATHANIEL SCHAFFNER, Plaintiff in Error.

*Opinion filed January 19, 1943—Rehearing denied March 10, 1943.*

ODE L. RANKIN, CAMERON LATTER, JAMES E. DANIELS, and SOL R. FRIEDMAN, (FRANKLIN J. STRANSKY, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JULIUS L. SHERWIN, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Nathaniel Schaffner, was indicted in the criminal court of Cook county for the murder of Emma Laisure while attempting to produce an abortion. A jury found him guilty and fixed his punishment at fourteen years' imprisonment in the penitentiary. Defendant prosecutes this writ of error.

Recital of certain undisputed facts at the outset, we believe, will be helpful for a proper understanding of the issues. Emma Laisure, twenty-seven years old, the wife of Earl Laisure, a taxicab driver, and the mother of two children, died July 7, 1941, on the occasion of her third visit to defendant's office, located at 4009 Lincoln avenue, in Chicago. She arrived shortly before 3:30 P. M., accompanied by her husband and four-year-old daughter. Her husband remained in the reception room, while she, at defendant's request, entered an adjoining room. She was placed upon a table, in a sitting position, her feet encased in stirrup-like hooks. Within five minutes, during the course of the treatment being administered by defendant,

she collapsed. Defendant removed her from the table to a studio couch in the room, administered a hypodermic injection in her arm, and applied artificial respiration, but to no avail. The husband remained until defendant pronounced her dead. When Laisure departed, defendant moved the corpse from the couch on to the table and closed the door. He did not call for an inhalator squad, neither did he notify the coroner's office nor summon the police. While the body was on the table in the closed room, defendant treated other patients until about 8:30 P. M. He then proceeded to Laisure's home, discussed with Laisure and the latter's sister-in-law, Theresa Gross, the hiring of an undertaker whom he, defendant, recommended. According to defendant's testimony, the body remained on the table in his office the entire period from shortly after 3:30 P. M. until after midnight, when he delivered the body in his own automobile to Laisure's home. Prior to taking the body out of his office, he wrapped it in a grey blanket. As he himself testified: "I got the body downstairs myself. *Rigor mortis* had set in; the body was almost like a board. I lifted it all the way down and rested it on my knees as I was advancing towards the street." Defendant was arrested about 2:30 A. M., July 8, 1941, in an alley at the rear of premises occupied by his sister. He insisted he was not Dr. Schaffner and claimed his name was Phillips until identified by Herbert Gross, a brother-in-law of deceased.

The evidence was conflicting as to the purpose of Emma Laisure's visits to defendant's office. Earl Laisure testified that on June 27, 1941, when he and his wife first visited defendant's office he announced to defendant he had brought his wife there for an abortion and that he handed to defendant a paper (People's exhibit 1) containing defendant's name and address, procured from Joseph Lamping, a fellow employee, pursuant to an inquiry for the name of a doctor who would perform an abortion. The witness was corroborated by William Garnet, also a fellow em-

ployee, who testified he was present at the time of the conversation. Lamping, called as a witness by defendant, admitted suggesting defendant's name and furnishing his address, but maintained he did so because Laisure had stated his wife was pregnant and that he desired the name of a maternity doctor who was fair and reasonable. Laisure further testified that defendant, after examining his wife on the first visit, stated she was pregnant and agreed to perform an abortion, but that he and defendant were unable to agree upon a fee, defendant demanding $65, later reduced to $50, whereas he insisted he could not pay more than $40. Defendant denied that when he first met Laisure and his wife he was handed People's exhibit 1, and did not recall whether Lamping's name was mentioned. He admitted examining Emma Laisure and determining her pregnancy, but declared that he strongly admonished Laisure and his wife against an abortion because of the risk involved, owing to his patient's advanced pregnant condition. Defendant asserted that there was no discussion of a fee for an abortion but that the difference between $65 and $40 related to the figure set by him as his charge for maternity care if he handled the case. He added that subsequent to his examination, Laisure exhibited four ten-dollar bills which he offered him if he, defendant, would agree to perform an abortion, but that he refused the money, stating "I am sorry, I cannot accept that kind of money for that kind of work."

On Emma Laisure's second visit to defendant's office July 2, 1941, she went alone. Defendant testified that on this occasion he merely assured her he was serious when he had warned her and her husband against abortion and its dangers.

Over the holiday on July 4, 1941, Laisure, his wife and two children, together with his wife's sister, Theresa Gross and her husband, Herbert, made an automobile trip to St. Louis, returning about 1:00 o'clock A. M. the morning of

July 7. From Laisure's testimony it appears that his wife complained of a headache and of being tired on the return trip, but that she apparently was not adversely affected by the trip; that on the morning of July 7 she prepared breakfast, and that she did not complain in any way about her health.

Laisure testified that when he and his wife arrived at defendant's office on July 7 defendant asked his wife if she was ready; that she replied, "Yes;" that, in response to defendant's query seeking his permission "to go ahead with this," he refused, stating that his wife insisted upon having an abortion performed; that defendant nevertheless stated his willingness to proceed; that his wife and defendant then entered an adjoining room; that only a portion of the table was visible to him; that within a few minutes he heard his wife shout, "I thought you said this wasn't going to hurt;" that defendant said something which he did not hear; that immediately thereafter his wife screamed, "I can't breathe, I can't breathe," and that he thereupon hurried into the room. At this time, according to Laisure, defendant was standing at his wife's feet, which were elevated and encased in stirrup-like hooks; defendant released one of her feet and she arose to a sitting position and collapsed, and defendant partly carried and partly dragged her into another room and placed her on a couch. He also testified that the operating table had newspapers at one end, covered with water, and that he observed a steaming sterilizer with instruments in it and several instruments lying on a table nearby, including a syringe. Laisure stated that his wife's color was "pasty" when she was brought to the couch, and that defendant injected something into her arm and used a stethoscope on her chest. In answer to Laisure's inquiry whether she was dead, defendant replied, "Now don't get excited. I will take care of everything. I will pay for all the funeral arrangements and everything else. Just be quiet. Don't tell anybody

about it. My career is at stake." According to Laisure, defendant then went back to the room where the table was located, picked up an instrument made of chrome metal and stated, "I don't know why she should die. That is all I used on her," the instrument being approximately thirteen inches long, with a handle on the end, and having a tubular extension about three-eighths of an inch in width, at the end of which was a little bulb about the size of a pea. Laisure then departed, stating he had to take care of his child. Before leaving, at defendant's request, he filled out a blue paper, introduced as People's exhibit 2, giving his name, address and telephone number.　•

Laisure added that about 9:00 o'clock in the evening, defendant came to his home and offered him $500 for funeral expenses; that upon his refusal, defendant handed him a card (People's exhibit 3) containing a funeral director's name, stating "This is a friend of mine, he will take care of the arrangements;" that later, in the presence of Theresa Gross, defendant said, "We will call her death heart trouble and mark that on the death certificate," and that defendant again admonished him not to go to the police, stating "My reputation is at stake. I will have to commit suicide if you go to the police," and that to Theresa Gross's query as to what he had done to Emma Laisure, defendant replied, "All I did was scrape her a little bit," stating that he did not inject anything into her. Defendant, according to Laisure, also stated that the funeral director would not take the body direct from his office but that he, defendant, would bring it in his car to Laisure's home about 1:00 or 1:30 o'clock in the morning. Theresa Gross substantially corroborated Laisure's testimony as to this conversation. Defendant admitted the visit to Laisure but stated that Laisure maintained he did not have any money and had not called an undertaker. In a statement the morning of his arrest, defendant admitted he had offered

to make a loan to Laisure, if needed, for the funeral expenses. Upon the trial, he admitted handing Laisure a card containing the name of a funeral director, but stated it was only because he desired to have the corpse removed from his office and that he volunteered to bring the corpse to Laisure's home. He denied stating to Theresa Gross that he had only "scraped" Emma Laisure a little bit or that he used the expression "scrape," explaining that he had merely told her he felt sorry for the unavoidable tragedy.

Laisure testified that the next time he saw defendant was about 1:15 A. M. July 8, 1941, in front of his home at 6144 North Hoyne avenue; that his father-in-law, John Dietrich, Gross and himself were seated in an automobile; that defendant came to the window of the car and rebuked Dietrich for having called the police, stating "Earl and I have an arrangement. I knew she was going to die before I worked on her." Dietrich corroborated Laisure as to this conversation. Defendant admitted having talked to them on this occasion, but denied saying that he knew Emma Laisure was going to die if he "worked" on her. Laisure, on cross-examination, admitted he had served twenty-five months in the Iona Reformatory of Michigan, having been convicted in 1930 on a charge of burglary and sentenced to serve a term of two and one-half to fifteen years' imprisonment.

Virgil A. Gant, a chemist employed in the Cook county coroner's laboratory, analyzed a 5-cubic-centimeter sample of liquid taken in his presence by Dr. Samuel A. Levinson from the uterus, or womb, of Emma Laisure during the course of a post-mortem examination. He expressed the opinion that it contained mixed cresols and, also, a certain amount of ordinary soap. Cresols, it appears, are the active principle in lysol and in many other disinfectants. Dr. Levinson, chief pathologist to the Cook county coroner, performed an autopsy on the body of Emma Laisure. He

testified that from the autopsy it was his opinion that Emma Laisure died as the result of shock, complicated by the presence of soap and cresol material in the uterus, hemorrhage in the wall of the uterus and within which was a three and a half months' male foetus. He declared that with the exception of the cresol material and hemorrhage, his examination of the organs, the brain, the chest and abdomen, disclosed no evidence of anything which would in any way interfere with the normal progressive physical development of the foetus. On cross-examination, Dr. Levinson testified he found no evidence of puncture or perforation in the stomach, intestinal tract or uterus; that he found the foetus and the afterbirth that holds it in place, all in a normal position when the subject is pregnant; that the hemorrhage in the uterus, in his opinion, was caused by erosion, burning; that such erosion was, in turn, caused by the cresol or lysol-like chemical found within the uterus, and that "in this case obviously you have a situation where a needle was placed within the uterine canal and not within the vagina. The material, however it was conveyed into the uterus, was conveyed by something which kept it from coming in contact with the walls of the vagina and vagina canal." Dr. Levinson described the mechanism of shock and stated it is not one isolated thing but is, instead, a combination of all the things brought about by the unnatural presence of material in a part of the anatomy which under normal conditions is not found there. The witness explained that shock might come about very suddenly but that there might be a perceptible interval between the time of the injection of the fluid and the occurrence of the shock; that it might come on very suddenly, or there might be an interval of a few seconds to a few minutes before the entire mechanism is set into motion again, and that "I arrived at the opinion that shock was brought about by the liquid chemical found in the uterus because that was the only positive thing I found in her body

that could bring about sudden death, unexpected death." In conclusion, Dr. Levinson gave his opinion that death could have been brought about by the soapy fluid or the cresol fluid alone without hemorrhage, and that "hemorrhage in itself, in this case in question, preceded by the soapy material together, combined, precipitated the syndrome of shock."

Gertrude Mack testified she was a patient of defendant; that on July 7, 1941, she was in his office to keep a 3:30 P. M. appointment, and that she saw Earl Laisure leading a woman into the doctor's office, "sort of holding her up."

Dr. Emil Weiss, an expert witness, testified for defendant. In answer to a hypothetical question, Dr. Weiss stated that, in his opinion, the cause of Emma Laisure's death was heart failure.

Defendant is a physician and surgeon, regularly licensed to practice in the State of Illinois since 1915. According to his testimony, Emma Laisure looked very pale when she arrived at his office on July 7; her breathing was shallow and rapid; she could not inhale deeply in a natural manner; her husband held her arm and helped her into the office, walking slowly; she said she had a pain in the center of the pelvis radiating towards the left, and Laisure assisted her onto an examining table, after which he felt her pulse, which was hardly palpable and faster than normal. He testified that he then placed a sheet over her and propped her feet up in the foot heels; that he noticed some fluid secretions exuding; that he made preparations for an internal examination; that he then adjusted his vaginal speculum; that he used small undipped cotton balls about an inch in diameter placed on a cotton forceps to swab out a large amount of a cloudy secretion; that the fluid resembled the embryonic fluid contained in the sac in which the foetus floats, and that it appeared as if the water surrounding the foetus had broken. Defendant testified that nothing further was done to Emma Laisure at this time;

that she just got up on the back of her hands, almost sitting up, her feet still propped up; that all of a sudden she said, "I cannot breathe," and screamed; that it all took place in a moment; that her husband ran in and, he, defendant, released one of her feet from a heel prop and she jumped off the table and collapsed; that he caught her before she could fall, and laid her on the couch; that he administered in her arm a hypodermic ampule of coramine, a heart and respiratory stimulant combined; that it did not seem to have any effect; that he next applied artificial respiration for about fifteen minutes; that he observed the patient was turning an ashen grey, a dead color, and that he then used his stethoscope. After fifteen minutes, he determined that Mrs. Laisure was dead. From his testimony it appears that when Laisure inquired whether his wife were alive or dead, he said, "I don't think she is alive, she looks medically dead to me;" that Laisure exclaimed, "Why did I do it? Why did I do it?"; that he, defendant, answered, "Well, I had warned you not to do anything. I told you that it was really risky and dangerous. It looks like you have ruptured the sac of water;" that Laisure stated, "No, we didn't rupture no sac of water, we didn't do anything, the only thing we have done, we have tried every kind of medicine to use;" that Laisure also stated his wife used a cone, which he had procured at a drug store; that Laisure inquired as to the next step, and defendant suggested telephoning an undertaker whose card (People's exhibit 3) he had on his desk. Prior to Laisure's departure, defendant had asked for his name, address and telephone number, and Laisure wrote People's exhibit 2. Defendant's movements later in the afternoon and evening and his subsequent arrest have been recounted. Defendant denied that there was any discussion in his office, when Emma Laisure died, between himself and Laisure about instruments; that he at any time displayed to Laisure any kind of instrument, or that he said to him, "This is what I used;" or that Emma

Laisure at any time said "I thought you said it wouldn't hurt." The reason he asked Laisure to close the transom and door, he explained, was because his wife screamed and he did not want to disturb other patients in the reception room. He also testified that after Emma Laisure's death he attended perhaps six patients and collected fees from some of them; that he made one house call, and that he left his office about 8:30 P. M.

Errors in giving and refusing instructions are charged. Instruction No. 9 related to the testimony of an accomplice. It told the jurors they were the judges of the credibility of an accomplice, and that while the testimony of an accomplice should be acted upon with great caution, still if they believed the purpose of such witness was to tell the truth, if his testimony carried conviction, and they were convinced of its truth beyond a reasonable doubt, they had the right to rely upon it. Defendant claims the instruction singled out Laisure's testimony and told the jurors to rely thereon if merely convinced of his "purpose" to tell the truth, thus obliterating or militating against the force and effect of the testimony of defendant himself and other witnesses who testified favorably to him. The criticized portion of the instruction required the jury to place reliance upon the testimony of an accomplice only if convinced of its truth. Instructions substantially similar have been approved. *People* v. *Harris,* 263 Ill. 406; *People* v. *Frankenberg,* 236 id. 408.

Instruction No. 6 defines the crime of murder by attempted abortion in the language of the statute. Defendant assails the instruction, claiming it should have concluded, "the defendant is guilty either of murder or manslaughter," instead of "murder" alone. Under the indictment and the theory of the supporting evidence introduced by the People, defendant was charged with one crime, namely, murder. Defendant's defense at all times was that he was innocent, not that he was guilty of the lesser crime of manslaughter.

Under the circumstances the instruction attacked was not erroneous. Where the evidence in a murder case would permit a jury to reduce the crime to manslaughter, an instruction on manslaughter should be submitted. Conversely, as here, where the evidence clearly demonstrates that the killing was murder, an instruction authorizing manslaughter is erroneous. *People* v. *DeRosa,* 378 Ill. 557.

Instruction No. 7, reads: "If the jury believe from the evidence, beyond all reasonable doubt, that the crime charged was committed and that the defendant immediately after the commission of the crime charged fled and remained away until taken into custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of the defendant." Defendant contends that this instruction does not limit the crime to the one charged in the indictment; that it does not require the "crime charged" shall have been committed by him; that it assumes he committed the crime, and, further, that the evidence was insufficient to justify the court's characterization of his movements and actions after the death of Emma Laisure on July 7, 1941, as "flight," or "remaining away." The circumstance of flight, where proved, raises no legal presumption that the accused is guilty of the offense charged against him. The fact of flight is, however, a circumstance which may be considered by the jury, in connection with all the other evidence in the case, as tending to prove guilt. (*People* v. *Herbert,* 361 Ill. 64.) Under the evidence introduced, the jury could scarcely have been misled by the instruction. When considered in the light of the evidence, the instruction sufficiently identified the crime with which defendant was charged. Also, it adequately appears that defendant did not report the death of Emma Laisure to the police and, when arrested in an alley more than eight hours after the death, he denied his identity and gave a fictitious name. Under these circumstances, an instruction involving flight was warranted.

Instruction No. 13, relating to the presumption of malice and intent requisite to make out the case as charged, advised, "if you believe from the evidence, beyond a reasonable doubt, that the defendant committed the assault upon the body of Emma Laisure by the means and in the manner and form as alleged in the indictment, and if you further find from the evidence in this case, beyond a reasonable doubt, that such assault was committed deliberately and was likely to be attended with dangerous consequences," malice will be presumed. The vices, among others, of this instruction, defendant insists, are an assumption that an assault upon the body of Emma Laisure had been committed, and an assumption that malice and intent are synonymous in meaning. The objections levelled against instruction No. 13 are without merit. *People* v. *Martin,* 376 Ill. 569; *People* v. *Stilson,* 342 id. 158.

Instruction No. 4 concluded: "In so weighing and considering the evidence, it is not the duty of the jury to discard and lay aside their common collective experience in life, but on the contrary it is the duty of the jury to use that experience in life in worldly affairs in weighing and considering the evidence." Complaint is made that this instruction accorded the jury the right to consider "their individual experiences in life and in worldly affairs" and admonished the jury that it was its duty so to do in weighing and considering the evidence. Jurors are not precluded from considering evidence in the light of their intelligence, common knowledge and the experience of mankind. *People* v. *Harvey,* 286 Ill. 593.

Refused instruction No. 1, tendered by defendant, was covered by instruction No. 6. Repetition is unnecessary, and there was no error in refusing to give the proffered instruction. *People* v. *Mitchell,* 368 Ill. 399.

It is next contended that counsel for defendant were unduly restricted in their cross-examination of Earl Laisure. The trial court sustained an objection to this ques-

tion asked of Laisure: "Do you ever expect to be prosecuted in this case for your complicity in this case?" Our examination of the testimony of this witness, on cross-examination, consisting of 139 pages of the record, discloses that sufficient latitude was permitted, and that such limitations as were imposed by the trial judge were not prejudicial to defendant. From the evidence adduced, together with the instructions defining an accomplice and the weight to be given to his testimony, the jury was in possession of ample information to enable a proper evaluation of Laisure's interest and his reasons for testifying as a witness for the People.

Defendant urges that his rights were greatly prejudiced by unfair and grossly improper conduct of an assistant State's Attorney in getting before the jury the insinuation that he, defendant, had been convicted and imprisoned for a violation of the Federal law relating to narcotics. Henry Carson was called to testify for the People, on rebuttal, with respect to defendant's general reputation for truth and veracity. The witness stated he was employed "in Chicago, Illinois, by the Bureau of Narcotics, United States Treasury Department;" that he had known defendant since January 20, 1932; that the latter's reputation was bad, and that he would not believe him under oath. Admittedly, no attempt was made upon the trial by the prosecution to prove that defendant had ever been convicted or accused of a violation of the Federal narcotics law. Defendant, in taking the witness stand in his own behalf, was subject to impeachment and to examination regarding matters affecting his credibility. No attempt was made to impeach the character of defendant, the questions asked of Carson pertaining solely to defendant's general reputation for truth and veracity. When an accused testifies in his own behalf, his credibility becomes subject to attack and to the same tests as are legally applied to any other witness. *People*

v. *Bakutis,* 377 Ill. 386; *People* v. *Hicks,* 362 id. 238; *People* v. *Johnson,* 333 id. 469.

On surrebuttal, thirteen witnesses testified as to defendant's good reputation for truthfulness. One of these, Mildred Moline, stated defendant had been for 24 or 26 years continuously her family physician, but admitted on cross-examination that for three years following March 30, 1932, he did not serve as her physician.

From the testimony of Carson and Mildred Moline, defendant argues that the jury was given the impression that he had served in prison for three years around 1932 on a narcotics charge and claims that such insinuation was accentuated by the remarks of an assistant State's Attorney in his closing argument to the jury, commenting on Carson's connection with the Narcotics Division of the Federal government. The right of a prosecuting attorney to comment on the evidence is entirely proper and within his province. (*People* v. *Herkless,* 361 Ill. 32.) The remarks asserted to be prejudicial were within the legitimate scope of argument.

Defendant contends that he was deprived of due process of law because the trial judge directed the adjournment of the jury's deliberations over Sunday, from midnight Saturday until Monday morning; also, that it was error for the trial judge to have absented himself from the criminal court building during the deliberations of the jury and to have delegated to the bailiff in charge of the jury, by telephone conversation, instead of by a formal court order, authority to bed the jury and to recess the jury's deliberations over Sunday. Section 15 of division XIII of the Criminal Code (Ill. Rev. Stat. 1941, chap. 38, par. 745, p. 1205,) provides for the retirement of a jury to consider of their verdict in any criminal case. While under the statute it would have been better practice for the trial judge to have delayed the retirement of the jury until Monday, it is not claimed

that the jury was not kept together. Neither is it contended that any outside influence was allowed to reach the jurors nor that defendant was prejudiced by virtue of the conduct of the trial judge in the respects mentioned. An analogous situation was presented for decision in *Rafferty* v. *People,* 72 Ill. 37. This court held that where there is no other error in the record save the mere irregularity complained of, the judgment of conviction will not be reversed unless defendant is shown to have been prejudiced thereby.

Finally, defendant contends that the evidence is insufficient to sustain his conviction. In particular, he points out that an impartial consideration of the evidence impels the conclusion that the soapy cresol material found in the uterus of Emma Laisure on the autopsy performed by Dr. Levinson was present owing to an attempt by deceased to relieve herself from pregnancy by abortifacient substances or chemicals, combined with soap, purchased by Earl Laisure and, further, that evidence is wanting to show that defendant, at any time or place, injected or was otherwise responsible for the presence of the chemical claimed by the prosecution to have caused her death. Determination of this question of fact was peculiarly within the province of the jury. The conflicting evidence has been narrated. Suffice it to say, we are of the opinion that the conduct of defendant during the afternoon and evening following the death of Emma Laisure was not compatible with innocence or the conduct which ordinarily would be expected from a doctor of medicine under like circumstances. The evidence proclaims defendant's guilt beyond a reasonable doubt and affords abundant support for the jury's verdict.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*