(No. 27567.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PETER PAVLUK, Plaintiff in Error.

*Opinion filed March 21, 1944—Rehearing denied May 11, 1944.*

JAMES E. DANIELS, and CAMERON LATTER, both of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JOSEPH A. POPE, all of Chicago, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Peter Pavluk, was found guilty of manslaughter by a jury in the criminal court of Cook county under an indictment charging him with the murder, by abortion, of Margaret Martin. Motions for a new trial and in arrest of judgment were overruled, and defendant was sentenced to imprisonment in the penitentiary for an indeterminate term of from one to fourteen years. He prosecutes this writ of error.

Defendant, a physician and surgeon since 1931, forty-four years of age, maintained his office and residence at 5425 South Halsted street, Chicago. It is admitted that on September 8, 1942, he treated Margaret Martin, unmarried, twenty-two years of age, at his office, and, the next evening, visited her professionally at the apartment of a friend and fellow employee, Mildred Buck, 4710 Kenmore avenue. Margaret Martin died Thursday morning, September 10,

and defendant was arrested and charged with responsibility for her death. The evidence discloses that on September 6, she visited Mildred Buck and, after announcing she was pregnant, solicited her friend's aid in procuring a doctor. September 8, Mildred Buck's husband, Woodrow, a Stock Yards employee, after an interview with defendant, an acquaintance, informed Margaret Martin he had arranged an appointment with defendant who had stated the price would be "around thirty dollars." Margaret Martin, her sister, Mary Jupin, and Buck arrived at defendant's office about nine o'clock Tuesday evening, September 8. Margaret Martin was invited into his inner office, and the door closed. Buck and Mary Jupin remained in a waiting room. Buck testified that shortly thereafter he heard an expression of pain; that, within five or ten minutes, Margaret Martin emerged, stating defendant required her home address, and that she did not want her mother to know; that, at this juncture, he, Buck, repaired to a tavern, telephoned his wife and obtained permission for Margaret Martin to come home with him; that, upon his return, after fifteen or twenty minutes, she was prepared to leave, and that he then furnished defendant his home address and telephone number, defendant promising to visit the patient the next evening.

Mary Jupin testified that about ten minutes after Margaret Martin entered defendant's inner office, she heard her scream; that her sister came out to the waiting room shortly thereafter and defendant gave her a pill and a glass of water; that she was shaky, very pale and crying; that Margaret Martin remained with her about ten minutes; that, during this period, defendant made two or three trips to the rear of his office with a little pan; that when her sister returned to the inner office, defendant came to the door and invited witness to enter, but that she refused; that about ten minues later she again heard Margaret scream; that she entered the room shortly afterward

and found her sister, shaky and nervous, on a table, and that defendant's wife who was also present, declared, "Oh, everything will be all right. You have nothing to worry about." Mary Jupin further testified that as they were preparing to leave, defendant stated there would not be any danger, adding, "I opened her up good. Everything is going to be all right. Of course, she will have pains, that is well understood;" that he advised her sister to keep walking back and forth, to frequent the washroom and to force herself; that he said he had "packed her up good;" that defendant promised to visit Margaret the following day; and that prior to leaving defendant's office she, Mary Jupin, paid him thirty dollars. Mary Jupin added that she was at Buck's residence the following evening, when defendant arrived; that Margaret informed him she could not sleep because of abdominal pains; that he reassured her such pains were to be expected, and that everything would be all right after the packing was removed.

Dr. Samuel A. Levinson, chief pathologist to the coroner of Cook county, testified to making a *post-mortem* examination of the body of Margaret Martin September 11, 1942, in the Cook county morgue. He testified he found many evidences of pregnancy; that there was an opening or tear in the front part of the uterus, immediately above the cervix, and that this tear communicated with the uterine canal, which contained some of the afterbirth, and that the lacerations near the opening of the cervix were traumatic, the result of instrumentation. He expressed the opinion that Margaret Martin died as a result of perforation of a pregnant uterus with an extravasation of foetal parts and blood into the abdominal cavity, the bones and organs of the newly forming baby, which should be in the uterine canal, being located lying in the abdominal cavity.

Two statements, made by defendant in the State's Attorney's office shortly after his arrest on September 10,

1942, were introduced in evidence, by stipulation and without objection, as People's exhibits 1 and 1A. In the first, obtained at 1:25 P. M., defendant stated that ten dollars was the entire amount received from the patient September 8; that, in his treatment, only two instruments were used, a speculum and a uterine tenaculum forceps, and that because he suggested hospitalization, no regular patient's card was filled out, declaring she was the first patient for whom no such record had been made. In the second statement, People's exhibit 1A, taken at 5:10 P. M., defendant stated he wished to change his previous statement as to his fee, and admitted receipt of thirty dollars, ten dollars being for office treatment, and twenty dollars for home visit. He also admitted probing the uterus in his original examination September 8.

Eight witnesses, one a physician and surgeon, testified to defendant's good reputation as a law-abiding citizen. Anna Pavluk, wife of defendant, testified she was present about four or five minutes during Margaret Martin's visit to his office September 8; that she noticed bleeding prior to his examination; that she saw defendant use but one instrument, a speculum, and that the portion of the treatment witnessed by her consisted of cleansing.

Defendant testified in detail as to his treatment the evening of September 8; in particular, that when Margaret Martin arrived at his office he filled out a regular index card containing her name, stated by her to be Marilyn Smith, her age, given as twenty-one, and her menstrual history; that she gave her address as 4710 North Kenmore avenue; that nothing was said concerning pregnancy; that she asserted she was unmarried, and denied having relations with men. He stated that, owing to her nervous and irritable condition, he administered morphine. Further, he explained he found his patient to be bleeding; that a bimanual examination disclosed nothing indicative of pregnancy; that, in his subsequent examination, he used a

speculum, a tenaculum, and a uterine forceps and did not place any probe or instrument of any kind into the uterus itself; that his treatment consisted primarily of cleansing and the insertion of a vaginal packing for absorbent purposes, and that recommended hospitalization was declined. Defendant admitted receiving, on Tuesday evening, a fee of thirty dollars, explained by him to include ten dollars for the examination and twenty dollars for hospital or laboratory expense. He denied certain statements attributed to him by Mary Jupin and disclaimed any intention or attempt to produce an abortion. Defendant also testified as to his visit to Buck's residence on the following evening, September 9, and his removal, in the presence of Mary Jupin, of the vaginal packing, described by him to have been inserted for cleansing purposes and to stop bleeding. He likewise testified to the issuance of a prescription, on a printed blank bearing his name, address and telephone number, calling for phenol-barbital, a simple sedative, and quinine, the latter being prescribed to prevent further bleeding.

Defendant makes the contention, among others, that the trial court improperly overruled his motion to strike all of Dr. Levinson's testimony. His argument is that there was no competent evidence showing the body on which his *post-mortem* examination was performed was the body of Margaret Martin, and that, consequently, proof of the *corpus delicti* is wanting. Dr. Levinson testified the body was identified to him by the keeper of the morgue. He described it as being approximately twenty-four years of age, white, female, five feet eight inches tall, and weighing about 140 pounds. This description tallied substantially with the testimony of Mary Jupin, who also testified she saw the body at the morgue on September 11. In the absence of any evidence to the contrary, the testimony sufficiently disclosed the autopsy was performed upon the proper body. The *corpus delicti* was, therefore, suffi-

ciently proved. *People* v. *Fitzpatrick,* 359 Ill. 363; *People* v. *Hanson,* 359 Ill. 266; *People* v. *Sapp,* 282 Ill. 51.

It is next insisted that the trial court erred in the admission of a conversation held out of defendant's presence between the deceased, Margaret Martin, and her sister. Mary Jupin testified that on the morning of Labor Day, September 7, 1942, Margaret informed her she was three months' pregnant and announced her intention of interrupting the pregnancy; that Mildred Buck was endeavoring to make an appointment with a doctor; that the money required would be borrowed from a loan company if not advanced by the witness; that she, Mary Jupin, thereupon remonstrated with Margaret, warning her of the dangers of the course proposed to be pursued, called attention to newspaper articles concerning abortion victims, and volunteered to take the baby when born. The admission of the testimony concerning her attempts to dissuade Margaret is claimed to be erroneous and violative of the rule which permits the acts and words of coconspirators to be received in evidence against a member of the conspiracy, though absent, the rule being limited to such acts or words as are in furtherance of the objects of the conspiracy. (*Spies* v. *People,* 122 Ill. 1; *Samples* v. *People,* 121 Ill. 547.) Under the circumstances here present, Mary Jupin, having participated in every act of the deceased, Buck and defendant toward the illegal end of having an abortion performed, her statements made in furtherance of the common design were competent. (*People* v. *Meisenhelter,* 381 Ill. 378; *People* v. *Hedge,* 284 Ill. 513; *Raymond* v. *People,* 226 Ill. 433.) Participation in the conspiracy having been established, and the record, containing, as it does, other evidence, clearly establishing guilt, the admission of the dissuading statements of Mary Jupin, while erroneous, does not require reversal of the judgment.

Error is claimed to have been committed in giving and refusing instructions. People's instruction No. 2, defining

murder by attempted abortion in the language of the statute, is attacked, because it included a reference to "medicine, drug, or other means whatever." It is argued that although the evidence disclosed defendant prescribed for Margaret Martin, no contention was advanced as to any criminal intent in so doing, and that, in consequence, the instruction was misleading and tended to confuse the jury. Defendant himself testified as to the purpose and effect of the morphine, phenol-barbital and quinine prescribed by him. The jury could not possibly have been misled. Instructions in the language of the statute have been approved. (*People* v. *Schaffner,* 382 Ill. 266.) People's instruction No. 4, it is charged, is misleading and inaccurate, in that it minimizes the degree of proof required to establish intent. The argument is made that the entire question of defendant's innocence or guilt turned upon his intent in doing what he admittedly did in treating decedent. The instruction informed the jury that, to constitute the offense charged, the intent alleged in the indictment was necessary to be shown, but that such intent need not necessarily be proved by direct evidence, and "if the jury believe, beyond a reasonable doubt, that the intent charged in the indictment is shown by facts and circumstances in evidence, that is sufficient." The instruction was properly given on behalf of the People, as embodying their theory of the case. (*People* v. *Priddy,* 327 Ill. 50; *People* v. *Grant,* 313 Ill. 69; *People* v. *Barrett,* 261 Ill. 232.) Likewise, the court did not err in refusing a tendered instruction advising the jury that where it is equally possible, from the evidence, to draw two conclusions, one favoring an innocent, and the other a guilty, intent, on the part of the defendant, a construction favoring innocence should be adopted. It is argued that this tendered instruction was a necessary complement to People instruction No. 4 and, since the intent of defendant in his dealings with his patient was an important issue in the case, he was entitled to the benefit of the proffered

instruction. Apart from not being justified, this instruction was superfluous, because, in other given instructions, both on behalf of the People and the defendant, the jury was advised as to the character and amount of evidence required to support a conviction.

Finally, it is contended the verdict was contrary to the manifest weight of the evidence. In support of this contention, it is insisted the conduct of defendant throughout the transaction betrayed no consciousness of guilt. Attention is directed to the issuance by him of prescriptions on printed blanks containing his name and other information and to his invitation admittedly extended to Mary Jupin to enter his private office, where she might have witnessed, had she chosen, every act performed on the person of her sister. On the other hand, it is inconceivable that a physician would be unable, upon examination, to determine pregnancy upon the record here made. Conflicting statements made by defendant shortly after his arrest and upon the trial with respect to the probing of the uterine canal, the amount of his fee, and the filling out of a record card, together with other evidence in the record abundantly supporting his guilt, render the decision as to his guilt peculiarly one for the jury. This court does not substitute its judgment for that of the jury unless satisfied the evidence was clearly insufficient to establish the guilt of a defendant beyond a reasonable doubt. (*People* v. *Schaffner,* 382 Ill. 266; *People* v. *Tamborski,* 356 Ill. 11; *People* v. *Vehon,* 340 Ill. 511.) The record is free from prejudicial error, and the character of the evidence adduced upon the trial dispels all reasonable doubt of defendant's guilt.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*

Mr. JUSTICE GUNN, dissenting.